RICHARD SPILLERS, Petitioner-Appellant, *v.* FIRST NATIONAL BANK
OF ARENZVILLE, Respondent-Appellee.

Fourth District No. 4—82—0156

Opinion filed October 26, 1982.

Law Offices of Ronald J. Kanoski, P.C., of Rushville (Ronald J. Kanoski
and Scott J. Butler, of counsel), for appellant.

Law Offices of Presney, Huffman, Kelly & Appleton, of Springfield (Robert A. Huffman, of counsel), for appellee.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

This is the second appeal arising out of a dispute between petitioner-appellant, Richard Spillers, and the First National Bank of Arenzville (bank) over the bank's repossession and sale of two items of collateral subject to the bank's perfected security interest.

On March 14, 1977, petitioner borrowed $25,000 from the bank for the purchase of a 1957 Lima 54-T crane. This purchase was financed with a six-month promissory note and secured by the crane as well as steel concrete forms. When the note matured, the bank requested payment but agreed to a 30-day extension. At the end of the extension, the bank confessed judgment on the note against petitioner, and on January 27, 1978, confirmed the judgment in the amount of $27,640.95.

The bank subsequently repossessed the crane and on April 22, 1978, sold it to a construction equipment dealer named Chuck Wessel. According to Mr. A. C. Hart, president of the bank, Wessel told the bank that the crane was worth $15,000 and that Wessel would pay the bank that amount. The bank made no attempt to appraise the property, advertise it for sale, or otherwise solicit bids, except for the understanding with petitioner that he would be given notice of the sale and an opportunity to find a higher bidder.

Spillers was notified on March 7, 1978, that a bid of $15,000 for the crane had been received from Wessel and was advised that sale would take place within 10 days from his receipt of the notice. On March 22, 1978, petitioner responded with a bid from a corporation owned and controlled by him in the amount of $16,000. No other notice was given petitioner of the sale, and on April 22, 1978, the crane was sold to Wessel for $15,000. Within five days of the sale to Wessel, the crane was sold to an equipment dealer in Aledo, Illinois, named Henderson. The price Henderson paid does not appear in the record. On November 3, 1978, Henderson sold the crane to an Iowa contractor named Hall for $27,500. Hall testified that he presently had the crane for sale for $35,000 but that he wasn't particularly interested in selling it.

After application of the sale price to the indebtedness, a deficiency of $12,640.95 still remained. The bank then proceeded to sell the steel concrete forms to reduce this amount. No notice of sale of the forms was given to petitioner. The forms were sold to a contrac-

tor who had his forms commingled with Spillers' forms for the sum of $6,120. Although petitioner had obtained a bid of $500 higher than the ultimate purchase price, this bid was withdrawn due to the confusion over which forms were Spillers'. The bank made no effort to segregate the forms, advertise them for sale, or seek a broker to sell them.

After these sales were made and the credits applied against the indebtedness, there still existed a deficiency of approximately $6,500. The bank garnished the sum of $1,020.73 from petitioner's checking account to further reduce the deficiency.

On October 13, 1978, Spillers filed a petition for damages alleging the sale was commercially unreasonable and praying for damages for the bank's failure to follow the dictates of the Uniform Commercial Code (Ill. Rev. Stat. 1977, ch. 26, par. 9—507(1)). Following a hearing on the petition, the trial court found that the sale of the crane and the forms was in all respects commercially reasonable.

On appeal, this court in *Spillers v. First National Bank of Arenzville* (1980), 81 Ill. App. 3d 199, 400 N.E.2d 1057, held that the sale of both the crane and the forms was conducted in violation of section 9—504(3) of the Uniform Commercial Code (Ill. Rev. Stat. 1977, ch. 26, par. 9—504(3)), and that such violation absolutely barred any deficiency judgment. We than remanded the case to the trial court with directions to vacate the deficiency order and to then consider Spillers' petition for damages. We stated that those damages would be the amount, if any, by which the net amount which should have been received from the sales of the chattels exceeded the judgment and costs confirmed on January 27, 1978.

On remand, the court considered the testimony of petitioner, the father of the initial purchaser, William Wessel, and further considered the evidence deposition of Thomas Speciale, an expert witness on the value of the concrete forms.

On the issue of the value of the forms, the court considered the evidence deposition of Speciale, a salesman for Economy Forms Corporation, the company which sold the petitioner the forms at issue. Speciale stated that Spillers had paid $11,400 for the forms in 1975 and that the same forms in February of 1978 would sell for approximately $12,500. According to Speciale, if the concrete forms belonging to Spillers were in good condition, they would sell for approximately 85% of their original cost. On cross-examination, Speciale testified that if his company were to repurchase forms that they had originally sold, they would pay the average 25% of their original cost.

Petitioner, who also testified at the hearing on remand, stated

that in his opinion the forms were worth what he had originally paid for them when they were repossessed and sold by the bank. He stated that this would be their retail value. Additionally, he felt that the reasonable market value of the crane was $35,000.

William Wessel, father of the initial purchaser, Chuck Wessel, related that he had been in the heavy equipment business for 15 to 20 years and was familiar with the values of construction equipment as of February 1978. Wessel stated that he had seen the crane and when asked if he had an opinion of the crane's value, indicated that if he were buying it for resale he would value it from $18,000 to $20,000, but that if he were buying it for his own use it would probably be worth a few thousand more.

On March 11, 1982, the trial court entered an order finding that an adequate and reasonable value of the used forms was equal to or below the price that the bank had obtained, and that the reasonable value of the crane was $18,000. The court then added this $3,000 in damages ($18,000—the crane's market value—minus $15,000—price obtained on resale) with the amount the bank garnished from Spillers' checking account ($1,020.73), and concluded that Spillers' total damages were $4,020.73. These damages were then offset against the deficiency of $6,500, which this court had barred. The court concluded that no damages were recoverable from the bank. Petitioner has appealed these findings, arguing that the trial court's findings of value were based upon an improper market measure and that the court's findings were against the manifest weight of the evidence.

As a preliminary matter, it has been noted by the parties that the bank garnished the sum of $1,020.73 from petitioner's checking account prior to our order directing that the deficiency judgment be vacated. On remand, the trial court offset this sum against the amount of the deficiency and refused to order this amount returned to petitioner. Our prior decision was clear in creating an absolute bar to any deficiency remaining. The trial court erred in not requiring the bank to return this amount.

The central issue in dispute between the parties is the interpretation of section 9—507(1) of the Uniform Commercial Code dealing with loss to the debtor as a result of a creditor's failure to follow the resale provisions of the Uniform Commercial Code.

The code provision under which the petition for damages was filed provides, in part:

> "(1) If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions.

If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part." Ill. Rev. Stat. 1977, ch. 26, par. 9—507(1).

At bar, the resolution of this dispute centers upon the word "loss." It is petitioner's contention that the loss should be measured against the property's retail value since the property was financed at retail, readily for sale at retail, and no evidence was introduced by the secured party to establish that the wholesale value was the best value under the circumstances. It is respondent's contention that a sale at the wholesale market is the measure to be applied and that in any event the price obtained, whether measured against wholesale or retail value, was commercially reasonable.

■■ Intertwined with a consideration of "loss" is the rule of section 9—504(3) which directs that "every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable." (Ill. Rev. Stat. 1977, ch. 26, par. 9—504(3).) Since the sale must be commercially reasonable, the loss should be measured against what a commercially reasonable disposition would obtain. The measure of damages for petitioner at bar is thus the difference between the value received at the sale and what a commercially reasonable disposition would have obtained. We note that at bar we are not involved with a situation where the absence of notice has prevented the debtor from procuring other parties with higher bids. In that situation the loss is fixed by reference to the debtor's proof that higher bids were obtainable but were not presented because of the creditor's failure to notify the debtor of the sale. Rather, the situation at bar proceeds upon the theory that the lack of notice, coupled with the creditor's failure to otherwise attempt to hold a sale in a commercially reasonable manner prevented a fair price from being obtained. Our inquiry at bar is thus: Was the bank required to sell at wholesale or retail to conduct a commercially reasonable resale?

The Uniform Commercial Code drafters certainly intended for the secured party to be able to dispose of collateral by flexible methods. As the Illinois Code Comment indicates, section 9—504(3) "removed all specific requirements of pre-Code statutory chattel security law with respect to the conduct of a sale after default under the security agreement in favor of the single broad requirement that every aspect of the sale must be commercially reasonable." (Ill. Ann. Stat., ch. 26, par. 9—504(3), Illinois Code Comment, at 340 (Smith-Hurd 1974).)

Moreover, the Code commentators indicate that in some situations a sale at wholesale is commercially reasonable. Respondent places much emphasis on the following comment to section 9—507 of the Illinois Uniform Commercial Code.

"One recognized method of disposing of repossessed collateral is for the secured party to sell the collateral to or through a dealer—a method which in the long run may realize better average returns since the secured party does not usually maintain his own facilities for making such sales. Such a method of sale fairly conducted is recognized as commercially reasonable under the second sentence of subsection (2)." Ill. Ann. Stat., ch. 26, par. 9—507, Uniform Commercial Code Comment, at 362 (Smith-Hurd 1974).

The cases cited by the parties support this rule. In *Hemken v. First National Bank* (1979), 76 Ill. App. 3d 23, 394 N.E.2d 868, a debtor brought suit against a bank and a truck dealer to recover under section 9—507(1) for the defendant-dealer's failure to give notice of the sale of repossessed collateral. The evidence of value indicated that the wholesale value of the collateral (truck) was $7,150, and that the retail value was $7,500. The truck was sold at its wholesale value and defendant's president testified that if a sale at retail were made, a $400 commission would have been charged. This commission would have offset any advantage from selling at retail. In *Hemken*, we affirmed the trial court's finding that plaintiff failed to show that the price was commercially unreasonable.

The case of *Cities Services Oil Co. v. Ferris* (1971), 9 U.C.C. Rep. Serv. 899, likewise supports the Comment's view. Although only a Michigan district court decision, the foregoing case has been authoritatively cited. (See White & Summers, Uniform Commercial Code sec. 26—11, at 1117 (2d ed. 1980); *Vic Hansen & Sons, Inc. v. Crowley* (1973), 57 Wis. 2d 106, 203 N.W.2d 728.) There the secured party repossessed collateral which was being sold on the wholesale market level and sold such goods on the wholesale market, though the creditor was in the business of distributing these very goods (tires, batteries, etc.) to several of its own retail outlets. The court held that the creditor's failure to sell the collateral through its retail outlets made the sale commercially unreasonable. The court noted:

"The next objection raised by the defendants is that the sale was not commercially reasonable. The court is fully aware that the plaintiff has the right to sell at wholesale or retail. However in a case, where a secured creditor maintains retail outlets for the sale of his products, it should be fairly obvious that by

selling the merchandise through the retail outlets, or to the retail outlets, they could have realized a great deal more to apply against the indebtedness due them through this method." 9 U.C.C. Rep. Serv. 899, 902.

These cases comport with the Code's view that absent retail markets readily available to the secured party, a sale at wholesale would normally be considered commercially reasonable since the expenses of selling on the retail market would offset any price advantages. At bar, the creditor maintained no retail outlets, and there is no indication as to what the cost of selling on the retail market would have been. Presumably these costs would include costs of storage, advertisement, and commission fees.

Other authorities cited by petitioner support the view that if collateral is financed at the retail level, then a sale at retail is required to be commercially reasonable. In *California Airmotive Corp. v. Jones* (6th Cir. 1969), 415 F.2d 554, a secured creditor brought suit to recover a deficiency judgment after the secured creditor repossessed and sold a Douglas DC7 airplane for $31,000 approximately 13 months after the debtor purchased it at a cost of $100,000 and made over $15,000 worth of improvements. The district court granted the secured creditor summary judgment but on appeal the Sixth Circuit held that a material issue of fact existed on the issue of whether the sale was commercially reasonable. There the court indicated that a sale of collateral at the wholesale market was not commercially reasonable since the collateral was financed on the retail market originally.

At bar, petitioner contends that he acquired both the crane and the forms on the retail market and that the sale on the wholesale market was commercially unreasonable. We disagree, however, with the reasoning of *California Airmotive Corp.* and believe that the proper inquiry is not at what market level the goods were financed, but rather what methods of sale the secured creditor had open to him at the time of repossession and resale.

Another consideration in deciding whether the collateral should be sold on the wholesale or retail market is whether the collateral is in a condition to be sold immediately or whether some repair or assembly is necessary. In *Transport Equipment Co. v. Guaranty State Bank* (10th Cir. 1975), 518 F.2d 377, the appellate court held that the trial court erred in computing damages pursuant to section 9—507(1) on the property's retail value when the evidence indicated that the collateral (truck body kits) were in a disassembled condition. The court in that case also held that a party seeking to recover damages pursuant

to section 9—507(1) of the Uniform Commercial Code has the burden of proving that the sale was commercially unreasonable.

Other authorities suggest that the wholesale-retail distinction is not helpful and that the loss to the debtor is the price that the creditor should have obtained in a commercially reasonable resale. For example, in *Vic Hansen & Sons, Inc.* the secured creditor, after selling an automobile for $1,595, repossessed the car and credited the debtor with the car's wholesale value of $700. In discussing whether $700 was a commercially reasonable price, the court denied a deficiency judgment on the grounds that the secured creditor had failed to prove that he was entitled to a deficiency judgment by showing that the sale was commercially reasonable. There, the court noted:

> "The plaintiff has not sufficiently established that $700 was a commercially reasonable price. There is no requirement or prohibition that the secured party sell at 'wholesale' or 'retail.' All that is required is the best possible price under the circumstances." 57 Wis. 2d 106, 114, 203 N.W.2d 728, 733.

We believe that the inquiry should not be whether the collateral was financed at retail or wholesale, but rather the inquiry is what price should the secured creditor have obtained under all of the circumstances in view of the available markets open to him. In *Hemken*, the evidence indicated that a wholesale market was a commercially reasonable disposition in view of the small disparity between the retail and wholesale market values which was offset by the expenses required to sell at retail. In *Cities Services* and *Vic Hansen & Sons, Inc.*, the secured party was required to sell at retail in view of the retail markets available to the secured creditor. In *Transport Equipment Co.*, in view of the fact that a sale on the retail market was not possible because of the assembly necessary to sell on that market, the wholesale measure was appropriate.

■ At bar, we do not believe the petitioner has met his burden of proving that a sale at retail or to an ultimate user rather than a dealer was the best obtainable method under the circumstances. No evidence was introduced to show that the expenses of holding, storing, selling, and refurbishing the crane or the concrete forms were minimal enough to require the bank to become a retailer of the construction equipment. The bank had no retail markets available, and we do not believe it is incumbent upon a secured party to use extraordinary methods of reselling. On the other hand, we are persuaded that the evidence supports the conclusion that the bank did not attempt to obtain a fair price under the circumstances. No efforts were made to obtain an independent appraisal, to advertise, or to seek

more than one bid for the crane.

■ As for the forms, while the bank received no independent appraisal, the bank did attempt to solicit at least three bidders in the general area. We do not believe that the bank was obligated to wait until a higher bidder appeared. The only shortcoming we have found with respect to the sale of the forms is the absence of notice to the debtor of the sale. We do not believe that the evidence otherwise demonstrates that the sale was commercially unreasonable. Petitioner presented no evidence to justify us in saying that but for the lack of notice a higher price was obtainable, and even assuming that the sale of the forms was commercially unreasonable, we do not think that the evidence supports a conclusion that the trial court's finding that the debtor suffered no loss as a result of the sale of these forms was against the manifest weight of the evidence. In this connection, we note the first sentence of section 9—507(2) of the Uniform Commercial Code which indicates that "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." (Ill. Rev. Stat. 1981, ch. 26, par. 9—507(2).) The only evidence of the forms' wholesale value came from Speciale and this testimony indicates that the price obtained was much larger than wholesale value. This testimony was admitted without objection, and no other proof was presented by petitioner on the forms' wholesale value.

With respect to the crane the debtor's "loss" under section 9—507(1) is likewise not based upon any absence of notice. Rather, the loss to the debtor was occasioned by the commercially unreasonable sale of the crane. We do not conclude that the sale to a dealer or at a wholesale market level is *prima facie* commercially unreasonable. Such a conclusion would be contrary to the drafter's belief that in the average situation a sale to a dealer "may realize better average returns since the secured party does not usually maintain his own facilities for making such sales." (Ill. Ann. Stat., ch. 26, par. 9—507, Uniform Commercial Code Comment, at 362 (Smith-Hurd 1974).) This method of disposition is tempered by the fact that not all sales to dealers are commercially reasonable, but only those sales which are "fairly conducted" as indicated in the Code Comment. At bar, we believe that the evidence supports the conclusion that the sale to the dealer, Wessel, was not "fairly conducted." Nonetheless, despite our conclusion that the sale to the dealer was commercially unreasonable, we do not believe that the trial court's ultimate finding, that the

debtor failed to prove that this sale and the sale of the forms resulted in any loss greater than the total debt, is against the manifest weight of the evidence.

In addition to the foregoing assignments of error, petitioner has raised three other issues for our consideration.

Petitioner argues that the trial court should not have placed reliance on Speciale's testimony taken at his evidence deposition. This testimony was read into the record and consisted of his statement that if his company were to repurchase used forms, which he indicated were often in poor condition, it would pay only 25% of original value. Petitioner argues that what Economy Forms would pay for any set of forms under any condition under a buy-back arrangement is irrelevant. We need not consider this issue, however, since petitioner made no objection either at the evidence deposition or at the time that it was read into the record. This argument is now waived. See *Tolbird v. Howard* (1969), 43 Ill. 2d 357, 253 N.E.2d 444; *Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933, 431 N.E.2d 1316.

Petitioner also argues that the trial court erred at the December 22, 1981, hearing in allowing William Wessel to testify after respondent had previously been granted a continuance under Supreme Court Rule 231(a) (87 Ill. 2d R. 231(a)) for the failure of Mr. Wessel's son, Chuck Wessel, to appear at an earlier hearing.

At the earlier hearing, the court agreed to a continuance because of the absence of Chuck Wessel on the condition that an affidavit complying with Supreme Court Rule 231 was filed by respondent. This affidavit was never filed, and petitioner argues that William Wessel should not have been allowed to testify.

In *Mann v. People* (1981), 98 Ill. App. 3d 448, 424 N.E.2d 883, this court held that it was an abuse of the trial court's discretion to grant a continuance under Supreme Court Rule 231(a) without an affidavit being filed in compliance with the rule. Likewise, at bar, the trial court did not require the affidavit to be immediately filed and did not later require the affidavit to be filed. The trial court erred in thus allowing the continuance without complying with Supreme Court Rule 231(a). Despite this error, petitioner has not suggested any prejudice and has not cited any authority for his argument that William Wessel should not have been allowed to testify as the result of the improper continuance of Chuck Wessel's testimony. In view of the fact that the burden of proof was on petitioner to demonstrate his loss, any error in allowing Wessel to testify was to petitioner's advantage since Wessel was called to testify on the crane's market value.

Finally, petitioner argues that the president of the bank and he

had an understanding that the concrete forms would not be sold unless the proceeds from the sale of the crane were insufficient. Petitioner suggests that since this was the understanding, the sale of the crane without notice was improper and the concrete forms should never have been sold. No authority is cited by petitioner for this proposition.

██ It is clear that any such issue has now been waived. Not only was this issue not considered in the prior appeal of this case, but our mandate was specific in remanding on the sole question of petitioner's right to damages. It is clear that questions which are raised or could have been raised in the first direct appeal may not be considered following remand. See *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich* (1979), 74 Ill. 2d 574, 387 N.E.2d 285; *Cohn v. Receivables Finance Co.* (1972), 7 Ill. App. 3d 869, 288 N.E.2d 894.

For the foregoing reasons, the order of the trial court refusing to require the return of the funds garnished from petitioner's checking account is reversed and remanded with directions that the trial court direct the return of this sum. The court's order which found that petitioner suffered no damages in excess of the total debt is affirmed.

Affirmed in part; reversed in part, and remanded with directions.

WEBBER and LEWIS, JJ., concur.