**STATE NATIONAL BANK, Appellant,**

**v.**

**ACADEMIA, INC., Joseph Winsberg, and Ingrid Winsberg, Appellees.**

**No. 13–89–015–CV.**

Court of Appeals of Texas, Corpus Christi.

Oct. 31, 1990.

Rehearing Overruled Jan. 10, 1991.

H. Hollis Rankin, III, Mullin & Rankin, McAllen, Harold Hirshman, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., Morris Atlas, Lisa D. Powell, Gary L. Gurwitz, Atlas & Powell, McAllen, Scott J. Atlas, Margaret C. Ling, Carlos Garcia, Betty R. Owens, Jill I. Groff, James A. Reeder, Jr., Vinson & Elkins, Houston, Susan G. Conway, Vinson & Elkins, Austin, for appellant.

Roger Reed, John L. Tippit, Munoz, Hockema & Reed, McAllen, for appellees.

Before NYE, C.J., and BENAVIDES and KEYS, JJ.

OPINION

BENAVIDES, Justice.

State National Bank (Bank), an Illinois corporation, brought the present action in Texas against Academia, Inc., based on a deficiency on a $340,000 loan made to Academia's predecessor in interest, A/C Uniform Company (A/C). Academia, and Joseph and Ingrid Winsberg as intervenors, counterclaimed for breach of contract, bad faith and unfair dealing, tortious interference, conversion and emotional distress, based on an oral agreement between the parties to extend the underlying note by one year and the Bank's wrongful collection efforts and foreclosure on collateral. After a jury trial, judgment was rendered against the Bank and in favor of Academia for $6,988,873.03, Joseph Winsberg for $3,670,497.68, and Ingrid Winsberg for $2,613,665.12. The Bank appeals by seventy-eight points of error. We reverse the judgment of the trial court and

render judgment that Academia and the Winsbergs take nothing.

The record reveals that Joseph Winsberg began work at his family's clothing store in Chicago, Illinois, in 1947. In the 1960s he started a business to manufacture and sell student uniforms to parochial schools in the Chicago area. Joseph and Ingrid Winsberg originally organized the business as A/C Uniform Company, an Illinois corporation, operating out of the Winsberg Department Store in Chicago. The Winsbergs eventually centered their efforts on the manufacturing and financial aspects of the business, while Donnamay and Walter Sifferman, friends of the family and joint owners of the business, marketed and sold the uniforms out of the Chicago store. The Winsbergs unsuccessfully tried to manufacture their uniforms out of a Wisconsin plant, but in 1984 eventually settled on McAllen, Texas, as the location for the manufacturing arm of their uniform business. The Winsbergs incorporated Academia in Texas with twin plants: one in Texas to cut the fabric; one in Mexico to sew the uniforms together. The completed uniforms were then sold through the Chicago store directly to children attending various parochial schools that had approved the uniforms for wear.

The significant banking relationships between State National Bank and A/C–Academia began in 1984, when Joseph Winsberg negotiated a line of credit for his uniform business. Other loans were made to Winsberg Department Store, which was dissolved in 1985, and to the North Clark Street Partnership (Partnership), composed of the Winsbergs, a Winsberg brother and the Siffermans, which owned the Winsberg Building and from which Winsberg Department Store and A/C leased their business premises. The Winsbergs guaranteed all three loans, and Bank officials testified that they looked at the loans as a package deal.

The primary loan in question is represented by a note by A/C to the Bank dated Dec. 18, 1985, in the amount of $340,000 (A/C note) and due on its face on October 30, 1986. The note was secured by a lien on A/C's inventory and accounts receivable, and guaranteed by the Winsbergs and Academia. In addition, there is a written letter of understanding of the same date stating that the loan may only be amended by written agreement signed by all parties.

In February of 1986, the Partnership defaulted on its building loan from the Bank, but the Bank took no immediate action on the default. The building loan was secured by a mortgage and assignment of rents on the Winsberg Building.

In July of 1986, in order to combine both the manufacturing and the sales arms of the uniform business under one corporation for marketing purposes, Academia purchased A/C and dissolved it as a separate entity, accepting responsibility for all of A/C's debts and liabilities. According to Joseph Winsberg, Bank officials had been pressuring him to repay the A/C note, due on its face in October. In order to comply, Winsberg began looking for a buyer for his uniform business as early as June of 1986. In August of 1986, Winsberg paid $37,000 on the principal of the A/C note. However, the balance of the loan remained outstanding on October 30, 1986, when A/C–Academia defaulted according to the terms of the written note.

On December 12, 1986, the Bank secured an Illinois judgment of replevin against A/C allowing seizure of the property securing the A/C note and the premises on which it was located. On December 15, 1986, pursuant to the judgment, representatives of the Bank along with the local sheriff closed down the Chicago location and changed the locks on the building. The Bank claimed its right to the business premises by virtue of the earlier default on the Partnership loan and an assignment of rents thereunder. Bank officials indicated that the immediate provocation for the foreclosure was information that the Bank had received indicating that Academia was holding a December "fire sale" to liquidate a large amount of its inventory at low prices.

Subsequently, representatives of the Bank refused the Winsbergs or Donnamay Sifferman access to the premises to recover

any of the non-collateral equipment and business records, or even personal property. The Winsbergs testified to several wasted trips to Chicago during which the Bank had reneged on promises to allow them access to non-collateral assets, including patterns for cutting the uniforms and the lists of school contacts which were essential to the continued operation of the business. Richard Gauthier, a vice-president of the Bank, testified that it refused to allow Academia and the Winsbergs to recover their non-collateral assets for fear that they would also take property which the bank asserted claims against, and that the Bank's intent in locking up the premises was not to harm Academia's business, but to protect the Bank's interest in the collateral. Nevertheless, this loss of use of its entire business operation in Chicago caused Academia's entire uniform business to be ruined.

In addition, Joseph Winsberg testified that during this period the Bank failed to cooperate to obtain a reasonable price for its sale of the business assets it was holding as collateral; he had found buyers who would have purchased the business for a reasonable price if the bank had only been willing to continue a portion of the loan. In one case, Winsberg testified that he had already arranged the terms of a sale of the business to Sweet–Orr & Co., but because Sweet–Orr was busy with another deal it postponed negotiations at the beginning of January which were never resumed after the Bank's own sale of the business.

In February of 1987, the Bank conducted a private sale of Academia's inventory for $250,000 to A Complete Uniform Company (Complete), whose president, Mason Smith, had been a primary competitor with a less than amicable relationship with the Winsbergs. Edward Halper, the Illinois lawyer representing the Bank at time of default and foreclosure, testified that the Bank's private sale of collateral to Complete was commercially reasonable under the circumstances. The Bank also leased the Chicago premises to Complete, which thereby also acquired the patterns, machinery, equipment and school contacts located there and belonging to Academia. After the purchase by Complete, it called the school contacts and informed them of a change in ownership of the business and asked if they wanted to continue their business with the new company. Bank officials, however, testified that the Bank did not sell the non-collateral assets to Complete, but simply made no arrangements with regard to the patterns and equipment belonging to Academia at the time it sold the inventory and leased the premises.

Since the Bank's sale to Complete had not entirely paid off Academia's debt, the Bank initiated the present Texas lawsuit against Academia for a deficiency due under the A/C note and foreclosure of the security interest in Texas. Academia counterclaimed that, based on an oral agreement with the Bank that the A/C note would not be called before the end of Academia's 1987 selling season, the Bank's demand of full payment on October 30, 1986, and its seizure of Academia's property to satisfy the indebtedness constituted both a breach of contract and a breach of the common law and statutory duties of good faith and fair dealing. Academia also claimed that the Bank had converted the property seized to satisfy the debt, and that the seizure of property effected a tortious interference with Academia's existing contracts to supply school uniforms, and with its agreement to sell these contracts to a third-party, Sweet–Orr & Co. Additionally, Joseph and Ingrid Winsberg, officers of and shareholders in Academia and guarantors of the A/C note, intervened in the lawsuit, adopting the claims of Academia and also asserting their own claims that the Bank's tortious conduct amounted to either intentional or negligent infliction of emotional distress.

After a lengthy trial the case was submitted to a jury, which returned the following pertinent findings:

1. Contract Claims. A/C Uniform executed a note in the original amount of $340,000 due on its face on October 30, 1986, but there was an oral agreement between the Bank and Joe Winsberg that the loan would not have to be fully repaid until after A/C's 1987 selling sea-

son. Academia foreseeably relied on the agreement and suffered resulting damages. The Bank's breach, resulting in seizure and sale or other disposition of Academia's property, proximately caused Academia to be ruined or destroyed.

2. Bad Faith. The Bank dealt unfairly and in bad faith with Academia, proximately causing Academia to be ruined or destroyed.

3. Tortious Interference. The Bank willfully or intentionally interfered with Academia's contracts or business relations with private schools in the Chicago area, proximately causing Academia to be ruined or destroyed. The Bank willfully or intentionally interfered with Academia's reasonably probable agreement to sell its A/C Uniform division to Sweet–Orr, proximately causing damage to Academia of $1,000,000.

4. Emotional Distress. The Bank intentionally, negligently, and by its failure to deal fairly and in good faith with Joe and Ingrid Winsberg proximately caused emotional distress to be suffered by both.

5. Actual Damages. At the time of the Bank's seizure, the fair market value of Academia, including its Texas and Mexico operations, was $1,500,000, and the value of A/C's inventory was $500,000, and of its patterns, business records, machinery and equipment in Chicago was $400,000. Total past and future emotional distress damages were assessed at $3,000,000 for Joe Winsberg and $2,000,000 for Ingrid Winsberg.

6. Exemplary Damages. Assessed in favor of Academia at $1,000,000 for bad faith, $1,000,000 for tortious interference with the school contracts, $1,000,000 for tortious interference with the reasonably probable agreement with Sweet–Orr, and $1,000,000 for the taking of Academia's leasehold, inventory, business records, goodwill, patterns and equipment. Assessed in favor of Joe Winsberg at $250,000 for bad faith, and $250,000 for infliction of emotional distress, and likewise in favor of Ingrid Winsberg at $250,000 for bad faith, and $250,000 for infliction of emotional distress.

7. Deficiency. The Bank did not sell the collateral for the A/C Uniforms note in a commercially reasonable manner.

Based on the verdict, the trial court rendered final judgment against the Bank in the following amounts:

Academia—$6,988,873.03, consisting of actual damages of $1,000,000 for tortious interference and $1,500,000 for market value of the business, exemplary damages of $4,000,000, and the rest as interest.

Joseph Winsberg—$3,670,497.68, consisting of actual damages of $1,500,000 for past and $1,500,000 for future emotional distress, exemplary damages of $500,000, and the rest as interest.

Ingrid Winsberg—$2,613,665.12, consisting of actual damages of $1,000,000 for past and $1,000,000 for future emotional distress, exemplary damages of $500,000, and the rest as interest.

*Choice of Law*

Before discussing the points raised on appeal as they relate to the individual causes of action sounding both in contract and in tort, we will briefly discuss the appropriate law to apply to all causes of action.

Concerning the claims sounding in contract, the effect of a contract is to be determined by the law intended by the parties to control, which may be specified in a valid choice of law clause. *See Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984); *Austin Building Co. v. National Union Fire Insurance Co.,* 432 S.W.2d 697, 701 (Tex.1968). The law of the state expressly agreed to between the parties will be applied if there is a reasonable relationship between the parties and the chosen state, and the law of the chosen state is not contrary to a fundamental policy of this state. *DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 678 (Tex.1988). In the present case, the note itself states that its validity, construction and enforcement are governed by Illinois law. In addition, both parties agreed at trial and on appeal that Illinois law governed the construction

of the note. Illinois clearly has a reasonable relationship to the parties as the state in which the Bank and A/C resided and where the security for the note was located. Moreover, the parties do not argue, and we find nothing to suggest, that Illinois' rules of construction and validity are contrary to a fundamental policy of Texas. Thus, the construction of the loan agreement represented by the note and its associated security agreement is accordingly governed by Illinois law.

Concerning the claims sounding in tort, however, the parties disagreed at trial and on appeal whether the trial court should apply Texas law, as favored by Academia, or Illinois law, as favored by the Bank. Before trial, there were discussions by the attorneys for both parties before the court concerning which states' law applied to the various causes of action. The parties agreed that Illinois law should be applied to the construction of the note, but disagreed about the law governing the remaining tort claims. After the parties concluded their arguments, the court announced that it would rule on this matter at a later time in the trial. However, no further mention is made in the record of the trial court's decision or which state's law the court in fact applied to the various causes of action sounding in tort.

Academia maintained that Texas law applied to the tort causes of action. The Bank, however, through the vehicle of Plaintiff's Motion for Summary Judgment, argued that Illinois law applied to all causes of action, requested the court to take judicial notice of Illinois law, and cited to that state's law on the various causes of action alleged by Academia, in accordance with Tex.R.Civ.P. 184 (repealed) and Tex.R. Civ.Evid. 202. Having cited with some particularity the Illinois elements of the relevant causes of action, the Bank thus placed sufficient information before the trial court for it to judicially notice and apply Illinois law consistent with the principles of choice of law. *See Keller v. Nevel,* 699 S.W.2d 211 (Tex.1985); *Ewing v. Ewing,* 739 S.W.2d 470, 472 (Tex.App.—Corpus Christi 1987, no writ); *Cal Growers, Inc. v. Palmer Warehouse and Transfer Co.,* 687 S.W.2d 384, 386 (Tex.App.—Houston [14th Dist.] 1985, no writ); *cf. Knops v. Knops,* 763 S.W.2d 864, 867 (Tex.App.—San Antonio 1988, no writ). When a court takes judicial notice of another state's laws, the court then has the same knowledge of that law as of its own law. *Cf. Marsh v. Millward,* 381 S.W.2d 110 (Tex.App.—Austin 1964, writ ref'd n.r.e.).

Because the question of which state's law applies is one of law for the court, in the absence of any indication as to which state's law the trial court actually applied, we presume that the trial court correctly analyzed the significant contacts involved, took judicial notice of the relevant law brought to its attention, and applied the correct law according to the established choice of law principles. *See Keller v. Nevel,* 699 S.W.2d 211 (Tex.1985).

In *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979), the Texas Supreme Court discarded the traditional lex loci delicti, or place of the wrong, approach to resolving conflicts of law in tort actions, and adopted the "most significant relationship" test of section 145 of the Restatement (Second) of Conflict of Laws (1971). Section 145(2) lists the contacts to be taken into consideration in determining which state has the most significant relationship to the occurrence and the parties with respect to an issue in tort, as follows:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

In *Gutierrez,* 583 S.W.2d at 319, the Court emphasized that the application of the "most significant relationship" analysis should not turn on the number of contacts any state has to the case, but more importantly on the qualitative nature of those contacts. There is no set formula for determining the significance of any particular contact, which must generally be weighed on a case-by-case basis and balanced

against other such contacts. Nevertheless, once the significant contacts have been established, the question of which state's law will apply is one of law. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984); *Gutierrez*, 583 S.W.2d at 319.

In the present case, the Bank is an Illinois corporation and Academia was a Texas corporation with its manufacturing division in McAllen, Texas and its marketing and sales division in Chicago, Illinois. The Winsbergs were residents of Texas at the time of the Bank's alleged tortious conduct but were originally from Chicago, where they had started the school uniform business in question, operating in conjunction with their then existing Chicago business, Winsberg's Department Store. Later, they incorporated the uniform business in Illinois as A/C Uniforms. Eventually, the Winsbergs moved the manufacturing arm of the company to McAllen as the Texas corporation, Academia. The financial relationship between the parties began in Illinois, however, where the note in question was executed, giving rise to the Bank's security interest in A/C's inventory and accounts. After the execution of the note, Academia acquired all the assets of A/C, which was dissolved as a separate entity and became merely a division of Academia.

The torts alleged against the Bank under theories of bad faith, tortious interference, and emotional distress, all arise from the Bank's actions in appropriating the premises and property of Academia's Chicago operation after the loan was called and the security interest foreclosed upon. Illinois then is clearly the State where the conduct and injury are centered, although the effects of that conduct were also felt by the Texas arm of Academia. Finally, the court order which allegedly allowed the Bank to foreclose upon and appropriate Academia's Chicago assets was issued in Illinois by an Illinois court. We hold that Illinois has the most significant contacts to the tort actions in this cause, to which Illinois law accordingly applies. *See Houston North Hospital Properties v. Telco Leasing, Inc.*, 688 F.2d 408 (5th Cir.1982).

*Academia's Contract Claims*

By its first point of error the Bank complains that Academia's breach of contract claims based on an oral agreement are barred by the merger doctrine and the parol evidence rule.

On December 18, 1985, Academia's predecessor, A/C, signed the $340,000 promissory note in question, which specifically stated that it was due on October 30, 1986. Joseph Winsberg claimed at trial, however, that he had a prior oral agreement with the Bank, through his servicing loan officer, James Lytle, that the loan would not have to be repaid until after A/C's 1987 selling season. The jury in turn found that this oral agreement existed and was breached by the Bank's calling of the note on October 30, 1986 and subsequent foreclosure against Academia's assets.

Under the Illinois parol evidence rule, evidence of prior or contemporaneous oral agreements is inadmissible to vary or contradict the terms of a writing otherwise unambiguous on its face, in the absence of allegations of mutual mistake, conditional delivery, lack of consideration, or fraud, none of which has been alleged in the present case. *See Main Bank of Chicago v. Baker*, 86 Ill.2d 188, 56 Ill.Dec. 14, 18–19, 427 N.E.2d 94, 98–99 (1981); *Land of Lincoln Savings and Loan v. Michigan Avenue National Bank of Chicago*, 103 Ill.App.3d 1095, 59 Ill.Dec. 794, 799, 432 N.E.2d 378, 383 (3 Dist.1982).

Initially, Academia contends that the Bank waived any reliance on the parol evidence rule by failing to object at trial to evidence of the oral agreement. Though the parol evidence rule of Illinois is applied in the present case as a matter of substantive law, waiver is a matter of procedure which is governed by Texas law. *See Penny v. Powell*, 162 Tex. 497, 347 S.W.2d 601, 602 (1961); *Goldston v. Hernandez*, 714 S.W.2d 350, 352 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Texas does not recognize waiver of the parol evidence rule merely by failure to object to the introduction of extrinsic evidence. *See King v. Fordice*, 776 S.W.2d 608, 612 (Tex.App.—

Dallas 1989, *writ denied*); *Benson v. Jones*, 578 S.W.2d 480, 484 (Tex.Civ.App.—Corpus Christi 1979, *writ ref'd n.r.e.*).

Academia next contends that the present oral agreement may still be considered, not to vary or contradict the note, but as an aid to construing it. Where a contract is not expressive of the complete agreement and understanding of the parties, consideration of antecedent proceedings does not serve to vary the contract terms but exemplifies the terms of the agreement. Further, all relevant evidence may be considered to determine whether a particular writing is the complete agreement of the parties. *Lewis v. Loyola University of Chicago*, 149 Ill.App.3d 88, 102 Ill.Dec. 425, 428, 500 N.E.2d 47, 50 (1 Dist. 1986). In *Lewis*, for instance, the court found that a form contract for a one year university teaching position as a professor of pathology at a stated salary did not embody the parties' complete agreement and understanding as to whether or not tenure would follow, and that extrinsic evidence should be allowed to show the complete understanding of the parties on this point.

In the present case, however, the original note clearly and unambiguously specifies the due date as October 30, 1986. The oral agreement that the note not come due until after the 1987 buying season does not amount to merely an additional understanding of the parties not embodied in the note, but directly contradicts the written due date. The Illinois courts have specifically held that prior oral agreements varying the clear due date on a note are not enforceable under the parol evidence rule. *Thomas v. First National Bank of Chicago*, 134 Ill.App.3d 192, 89 Ill.Dec. 8, 24–25, 479 N.E.2d 1014, 1030–31 (1 Dist.1985); *Land of Lincoln*, 59 Ill.Dec. at 799, 432 N.E.2d at 383; *see also Main Bank*, 56 Ill.Dec. at 19, 427 N.E.2d at 99.

Nevertheless, Academia contends that the due date on the note was made incomplete or inconsistent by a subsequent written confirmation letter sent by Winsberg to the Bank, and allegedly tacitly accepted by the Bank. The confirmation letter states that Academia agreed to keep its salaries low and reduce its inventory through 1987. Nothing in this confirmation letter sent to the Bank, however, suggests an inconsistency between the due date on the particular note and the contemplation, expressed in the letter, of some continuation of a financial relationship between the parties beyond that date. The parties' contemplation of a continuing financial relationship and agreements made to foster that relationship are not at all inconsistent with Bank's insistence that a particular note be paid according to its terms.

Academia's contract claim based on breach of the oral agreement is therefore barred by the parol evidence rule. We sustain the Bank's first point of error.

By its twelfth point of error the Bank complains that promissory estoppel cannot form the basis of an affirmative award. The verdict includes findings that Academia and the Winsbergs relied to their detriment on the Bank's oral promise, and that the Bank should have foreseen such reliance, which ultimately caused appellees to lose their business. Appellees assert this as an alternate basis to recover the value of their business under a theory of promissory estoppel.

Promissory estoppel is an equitable device invoked to prevent an individual from being injured by a change in position made in reasonable reliance on another's conduct. *Verdeyen v. Board of Education of Batavia*, 150 Ill.App.3d 915, 103 Ill.Dec. 620, 629, 501 N.E.2d 937, 946 (2 Dist.1986). The breach of a promise which the law does not regard as binding, however, does not warrant the application of the doctrine of promissory estoppel. *See Evans v. Fluor Distribution Co.*, 799 F.2d 364, 367 (7th Cir.1986); *Sinclair v. Sullivan Chevrolet Co.*, 31 Ill.2d 507, 202 N.E.2d 516, 519 (1964); *Ozier v. Haines*, 411 Ill. 160, 103 N.E.2d 485, 487 (1952); *Libby–Broadway Drive-in, Inc. v. McDonald's System, Inc.*, 72 Ill.App.3d 806, 28 Ill.Dec. 802, 805, 391 N.E.2d 1, 4 (1 Dist.1979) (promissory estoppel unavailable to recover based on contracts unenforceable under the statute of frauds).

Specifically, where the parties enter into a completed contract, the court may not apply promissory estoppel to disregard the plain provisions of that contract. *See Barker–Lubin Co. v. Wanous,* 26 Ill. App.2d 151, 167 N.E.2d 797 (4 Dist.1960).[1] In the present case, the plain provisions of the note called for an October 30, 1986 due date, and we hold that Illinois law does not provide a means to disregard that date by claiming promissory estoppel. Point of error twelve is sustained.

*Academia's Tort Claims*

By its eighteenth point of error the Bank complains that Illinois law does not recognize a duty of good faith and fair dealing as an independent cause of action in tort. By its fourteenth through fifteenth points of error the Bank challenges the legal and factual sufficiency of the evidence to show that it dealt unfairly and in bad faith with appellees.

A covenant of good faith and fair dealing is implied in every contract as a matter of law, absent an express disavowal. Good faith between contracting parties requires one vested with contractual discretion to exercise it reasonably and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Vincent v. Doebert,* 183 Ill.App.3d 1081, 132 Ill.Dec. 293, 299, 539 N.E.2d 856, 862 (2 Dist.1989); *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 81 Ill.Dec. 156, 169–70, 466 N.E.2d 958, 971–72 (1 Dist.1984); *Foster Enterprises, Inc. v. Germania Federal Savings and Loan Association,* 97 Ill.App.3d 22, 52 Ill.Dec. 303, 308–09, 421 N.E.2d 1375, 1380–81 (3 Dist. 1981). In a line of credit agreement of indefinite duration between bank and borrower, for instance, the law will imply a good faith duty on the part of the bank to maintain the line for a reasonable time. *See Carrico v. Delp,* 141 Ill.App.3d 684, 95 Ill.Dec. 880, 884, 490 N.E.2d 972, 976 (4 Dist.1986). Unlike the present case, however, in *Carrico* the line of credit agreement was without any indication of the duration intended by the parties. Rather than grant the Bank absolute discretion to terminate the line of credit at will, the court implied a good faith obligation on the part of the Bank to maintain the line of credit for a reasonable length of time.

The principle of performance in good faith comes into play in defining and modifying duties which grow out of specific contract terms and obligations. It is a derivative principle and does not create an independent cause of action. *Bachmeier v. Bank of Ravenswood,* 663 F.Supp. 1207, 1225 (N.D.Ill.1987) (simply having a banking relationship does not give rise to a duty of good faith and fair dealing independent of any contract); *Gordon v. Matthew Bender & Co.,* 562 F.Supp. 1286, 1289 (N.D.Ill.1983); *Harrison v. Sears, Roebuck & Co.,* 189 Ill.App.3d 980, 137 Ill.Dec. 494, 502, 546 N.E.2d 248, 256 (4 Dist.1989); *Martin v. Federal Life Insurance Co.,* 109 Ill.App.3d 596, 65 Ill.Dec. 143, 150, 440 N.E.2d 998, 1005 (1 Dist.1982). Therefore, no obligation should be implied which is inconsistent with the terms of the contract itself. *Harrison v. Sears, Roebuck & Co.,* 189 Ill.App.3d 980, 137 Ill.Dec. 494, 502, 546 N.E.2d 248, 256 (4 Dist.1989).

In *Bane v. Ferguson,* 707 F.Supp. 988 (N.D.Ill.1989), the court explained its understanding of the Illinois duty of good faith and fair dealing in the following terms:

> The duty applies not in an overarching fashion, covering every aspect of the parties' relationship, but rather it limits one party's discretion *where a contract gives the party that discretion.* ... The Illinois courts do not use the duty to overcome the parties' expectations, unlike doctrines which prevent the parties from entering into non-mutual contracts, contracts which are unconscionable, or which violate public policy. Were this court to employ the good faith doctrine improperly, the court risks destroying

1. By comparison, Texas courts have explicitly held that promissory estoppel will not circumvent the parol evidence rule. *Stavert Properties, Inc. v. Republicbank of Northern Hills,* 696 S.W.2d 278, 282 (Tex.App.—San Antonio 1985, *writ ref'd n.r.e.*); *Joseph v. Mahoney Corp.,* 367 S.W.2d 213, 215 (Tex.Civ.App.—Austin 1963, *writ ref'd n.r.e.*).

the legitimate expectations of the parties, as well as substituting its judgment for those who are better able to assess their positions.

*Bane,* 707 F.Supp. at 994–95 (emphasis added).

In the present case, the jury found simply that the Bank dealt unfairly and in bad faith with Academia, which proximately caused Academia to be ruined or destroyed. Academia claims that the Bank acted in bad faith both by breaching its alleged oral agreement not to call the note before the end of the 1987 selling season, and by the manner in which it foreclosed on, and disposed of the collateral securing the note, and wrongfully took possession and disposed of other property belonging to Academia. We first note that claims based on breach of the oral agreement would be contrary to the written contract, and therefore cannot form the basis for breach of the covenant of good faith and fair dealing, as we similarly discussed with regard to promissory estoppel claims. *See Harrison,* 137 Ill.Dec. at 502, 546 N.E.2d at 256; *cf. Barker–Lubin,* 167 N.E.2d 797. The remaining bad faith claims are based on the Bank's collection efforts against Academia, including the decision itself to foreclose, the subsequent disposition of collateral covered by the security agreement, and the wrongful seizure, withholding and disposition of other assets not covered by the security agreement.

As for the Bank's decision to foreclose on the collateral rather than to allow Academia more time to work out its financial problems, under the note and security agreement the Bank clearly had the right to demand payment on October 30, 1986 and to foreclose on the collateral upon default. The Bank's rights under these agreements were clear and cannot subsequently be limited by labelling its decision to pursue collection efforts as discretionary. *See Vincent,* 132 Ill.Dec. at 299, 539 N.E.2d at 862; *Dayan,* 81 Ill.Dec. at 169–70, 466 N.E.2d at 971–72; *Foster Enterprises,* 52 Ill.Dec. at 308–09, 421 N.E.2d at 1380–81. Vague notions of fairness limiting these rights based on the overall relationship between the parties would impermissibly extend the covenant beyond mere definition or modification of the terms of the note and security agreement. *See Bachmeier,* 663 F.Supp. at 1225; *Gordon,* 562 F.Supp. at 1289; *Harrison,* 137 Ill.Dec. at 502, 546 N.E.2d at 256; *Martin,* 65 Ill.Dec. at 150, 440 N.E.2d at 1005.

Regarding the Bank's subsequent disposition of the collateral covered by the security agreement, Academia claims that the Bank acted in bad faith by selling the collateral to Winsberg's "enemy," Mason Smith, for an inadequate price.

In Illinois, legal title to property subject to a security interest passes to the creditor after he has taken possession following default, but the debtor retains the rights and property interests in the collateral provided under the Illinois Uniform Commercial Code, Ill.Rev.Stat. ch. 26 (1983). *Kouba v. East Joliet Bank,* 135 Ill.App.3d 264, 89 Ill.Dec. 774, 778, 481 N.E.2d 325, 329 (3 Dist.1985). Article 9 of the Code defines the Bank's duties with respect to that collateral and provides remedies for violation of those duties. Specifically, section 9–507 provides that the debtor may recover damages for any loss caused by a commercially unreasonable disposition of collateral. *See Kouba; Spillers v. First National Bank of Arenzville,* 109 Ill.App.3d 1100, 65 Ill.Dec. 557, 441 N.E.2d 872 (4 Dist.1982). In addition, section 1–203 imposes a statutory obligation of good faith in the performance of every duty under the code, which codifies the common law covenant. *See Foster Enterprises,* 52 Ill.Dec. at 308, 421 N.E.2d at 1380.

Assuming that the Bank did thus dispose of the collateral in a commercially unreasonable manner in violation of the provisions of section 9–507, however, Academia relinquished any statutory remedy by failing to plead it. *See Kouba,* 89 Ill.Dec. at 777, 481 N.E.2d at 328. Academia nevertheless seeks to create a remedy by labeling the Bank's conduct a more general breach of the duty of good faith and fair dealing. As stated earlier, the covenant of good faith and fair dealing does not create an independent cause of action un-

der Illinois law. *Bachmeier,* 663 F.Supp. at 1225; *Harrison,* 137 Ill.Dec. at 502, 546 N.E.2d at 256; *see also Betterton v. First Interstate Bank of Arizona, N.A.,* 800 F.2d 732, 735–36 (8th Cir.1986). Since Academia failed to rely on the section 9–507 remedies, it cannot create an independent breach of good faith cause of action for the conduct proscribed by section 9–507. Having failed to invoke the statutory remedy under section 9–507, Academia must rely on common law remedies for wrongful repossession, trespass or conversion. *See Kouba,* 89 Ill.Dec. at 777–78, 481 N.E.2d at 328–29.

Finally, Academia complains that the Bank, in the process of foreclosing on the legitimate collateral, also took possession of other assets not covered under the agreement, and refused to return them to Academia. However, though the Bank's actions with regard to the non-collateral assets may have been wrongful or tortious conduct in the form of trespass or conversion, this conduct fell outside the scope of the note and security agreement and cannot be characterized as a breach of contract or breach of a duty of good faith and fair dealing arising under these instruments. Other adequate remedies sounding in tort were available to Academia, but the covenant of good faith and fair dealing does not apply to every tortious act surrounding the Bank's performance under the agreement. *See Bane,* 707 F.Supp. at 994–95; *Bachmeier,* 663 F.Supp. at 1225; *Martin,* 65 Ill.Dec. at 151, 440 N.E.2d at 1006; *see also Betterton,* 800 F.2d at 735–36. As the court stated in *Martin,* "existing principles of tort law are adequate without our creating a new action based on a vague notion of fair dealing." *Id.,* 65 Ill.Dec. at 151, 440 N.E.2d at 1006. We sustain the Bank's fourteenth, fifteenth and eighteenth points of error.

By its twenty-first and twenty-fourth points of error, and by its twenty-sixth and twenty-ninth points of error, respectively, the Bank challenges the legal and factual sufficiency of the evidence to show that it willfully, intentionally, or maliciously interfered with Academia's school contracts or business relations, or with its reasonably probable agreement to sell the company to Sweet–Orr. Academia claimed at trial and received favorable jury findings and judgment, that the Bank's actions in wrongfully foreclosing and depriving it of necessary business assets caused it to lose a number of individual school contracts, as well as a prospective opportunity to sell the entire business. The Bank, however, among other things contends that under Illinois law there was no evidence to show an intentional interference directed at the relevant business relationships.

The two torts stemming from interference with business relations, namely tortious interference with a contractual relationship and tortious interference with prospective business relations, both recognize that a person's business relationships constitute a property interest and as such are entitled to protection from unjustified tampering by another. *Belden Corp. v. Internorth, Inc.,* 90 Ill.App.3d 547, 45 Ill. Dec. 765, 768, 413 N.E.2d 98, 101 (1 Dist. 1980). The general principle of tortious interference with business relations is set forth in the Restatement of Torts § 766 (1939), which provides:

> [O]ne who, without a privilege to do so, induces or otherwise purposely causes a third person not to
>
> (a) perform a contract with another, or
>
> (b) enter into or continue a business relation with another, is liable to the other for the harm caused thereby.

*See Smith–Shrader Co. v. Smith,* 136 Ill. App.3d 571, 91 Ill.Dec. 1, 7, 483 N.E.2d 283, 289 (1 Dist.1985).

Specifically, the elements of tortious interference with a contractual relationship are: (1) a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach. *Dangeles v. Muhlenfeld,* 191 Ill. App.3d 791, 138 Ill.Dec. 815, 821–22, 548

N.E.2d 45, 51–52 (2 Dist.1989). In the present case, however, both the school contacts and the prospective sale to Sweet–Orr were not valid and enforceable contracts.

The school contacts were merely a list of clients with whom Academia had done business in the past and reasonably expected to do business in the future. All of the relevant testimony at trial revealed that neither Academia nor any of the schools were contractually bound to sell or purchase the uniforms in question from year to year. Joe Winsberg testified that the schools would approve certain companies each year from which their students could purchase their uniforms. Academia kept a list of those schools that continued to approve its uniforms and would contact the schools yearly to solicit their continuing approval for the next year.

The Sweet–Orr sale, as is evident from their letter to Winsberg admitted into evidence to support the purchase offer, was still at the negotiation stage and had been put on hold by Sweet–Orr until it had completed other business transactions occupying its time. The jury, moreover, specifically found only a "reasonably probable agreement," rather than an actual agreement, with Sweet–Orr.

The elements of the tort of interference with prospective business relations are: (1) the existence of a valid business relationship or plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of this relationship or expectancy; (3) intentional interference by defendant inducing termination of the relationship or preventing the expectancy from ripening into a valid business relationship; and (4) damage to plaintiff as a result of the interference. *Dangeles v. Muhlenfeld,* 191 Ill.App.3d 791, 138 Ill.Dec. 815, 820, 548 N.E.2d 45, 50 (2 Dist.1989).

Tortious interference with prospective business relations is described as a "purposely" committed tort. In *Bank Computer Network Corp. v. Continental Illinois National Bank and Trust Co.,* 110 Ill.App.3d 492, 66 Ill.Dec. 160, 442 N.E.2d 586 (1 Dist.1982), for instance, the court reasoned that a bank's action in offsetting plaintiff's debt against his checking account and dishonoring certain of his checks did not show that the Bank's conduct, even if wrongful, was intended, or had as its purpose, to interfere with plaintiff's business relations, but that it was instead "purely incidental interference resulting from the pursuit of the defendant's own ends." *Id.* 66 Ill.Dec. at 167, 442 N.E.2d at 593.

In addition, Illinois courts have stated that tortious interference with prospective business relations requires some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff. *McIntosh v. Magna Systems, Inc.,* 539 F.Supp. 1185, 1192–93 (N.D.Ill. 1982); *DP Service, Inc. v. AM International,* 508 F.Supp. 162, 167 (N.D.Ill.1981); *Galinski v. Kessler,* 134 Ill.App.3d 602, 89 Ill.Dec. 433, 437–38, 480 N.E.2d 1176, 1180–81 (1 Dist.1985); *Crinkley v. Dow Jones and Co.,* 67 Ill.App.3d 869, 24 Ill.Dec. 573, 581, 385 N.E.2d 714, 722 (1 Dist.1978); *Parkway Bank and Trust Co. v. City of Darien,* 43 Ill.App.3d 400, 2 Ill.Dec. 234, 238, 357 N.E.2d 211, 215 (2 Dist.1976).

This raises the question whether the "conduct" itself must be directed at a third party, or merely the intended, but possibly indirect, "effects" of that conduct, making "conduct directed toward a third party" simply another way of emphasizing that the conduct must "purposely" interfere with the third party contact. The court in *DP Service* suggests that, even though the defendant's *motive* was, or could have been, to interfere with third party business relations, if plaintiff has not shown any *act* of the defendant directed toward the third party, no action will lie for intentional interference with prospective business relations. *Id.* at 168.

Furthermore, the court in *Galinski* noted that it was in accord with *DP Service's* interpretation of the requirement that conduct be directed toward a third party, and rejected the appellant's suggestion that the requirement merely focuses on the purpose

of the defendant's misconduct. *Galinski,* 89 Ill.Dec. at 437, 480 N.E.2d at 1180. Moreover, the *Galinski* court also noted a distinction between the present requirements for tortious interference with *prospective business relations* and those for tortious interference with a *contractual relationship,* which may be shown by conduct directed merely at preventing the plaintiff from being in a position to perform the contract. *Id.,* 89 Ill.Dec. at 438, 480 N.E.2d at 1181; *see also Scholwin v. Johnson,* 147 Ill.App.3d 598, 101 Ill.Dec. 67, 73, 498 N.E.2d 249, 255 (1986). Since both are "purposely" committed torts, the distinction made by *Galinski* can have no effect unless it requires that the conduct itself be directed at a third party to support a cause of action for tortious interference with prospective business relations.

In the present case, although we can infer from the evidence that the Bank was aware of Academia's prospective business relations with the schools and with Sweet–Orr, and that its actions would indirectly jeopardize or destroy those relations, the Bank's conduct was directed only against Academia and its business assets. There was no direct contact with, or interference involving, the relevant third parties. All of the Bank's actions secondarily affected the third party business relations only to the extent that they prevented Academia from continuing its business and remaining in a position to maintain those relations. We hold that the evidence was legally and factually insufficient to show any direct interference by the Bank, and that there was, therefore, no evidence under Illinois' concept of that tort, to support the findings that the Bank intentionally, or "purposely," interfered with Academia's business relations with the schools or with Sweet–Orr. We sustain the Bank's twenty-first, twenty-fourth, twenty-sixth and twenty-ninth points of error.

Thus, we find no evidence to support Academia's judgment on the theories upon which the case was tried. Academia sought to cast the Bank's actions in terms of breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference, rather than seek recovery for conversion of, or trespass to, the non-collateral assets, and under the Illinois Uniform Commercial Code provisions for wrongful foreclosure and disposition of collateral. While the Bank's actions may have caused injury to Academia's business, Academia may not cast that injury in whatever form of action may seem most attractive, without regard to the true nature of the Bank's conduct and the redress allowed under Illinois law.

*Other Claims*

By its thirtieth point of error the Bank complains that the Winsbergs lacked standing to sue for emotional distress. By its thirty-second through thirty-fourth points of error the Bank challenges the legal and factual sufficiency of the evidence to show that it intentionally caused emotional distress to the Winsbergs or was negligent in its dealings with them, or that any such negligence proximately caused emotional distress to the Winsbergs.

If a corporation is injured by a party's conduct, the corporation is the proper party to bring suit, and shareholders of the corporation injured by virtue of the diminution in value of their shares may not recover directly for their losses, but are compensated indirectly if the corporation recovers because its assets are replenished. *Kennedy v. First National Bank of Decatur,* 129 Ill.App.3d 633, 85 Ill.Dec. 236, 239, 473 N.E.2d 604, 607 (4 Dist.1985); *see also Kush v. American States Insurance Co.,* 853 F.2d 1380, 1383 (7th Cir.1988); *Twohy v. First National Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985); *Continental Illinois National Bank & Trust Co. v. Stanley,* 585 F.Supp. 1385, 1388 (N.D.Ill. 1984). Specifically, in *Kush* the shareholder of an insured corporation brought suit for infliction of emotional distress against the insurer when it denied coverage to the corporation. In rejecting the validity of the emotional distress claim by the shareholder, who was neither policyholder nor beneficiary, the appellate court noted its reluctance to disregard the line between shareholder and corporation where the di-

rect duty was owed to the corporation alone and the allegedly tortious acts were directed only at the corporation. *Kush*, 853 F.2d at 1383–84.

Generally, courts allow a shareholder to sue directly only where there is a direct injury to the shareholder in his or her individual capacity, independent of any duty owed the corporation. *Kush*, 853 F.2d at 1383; *Twohy*, 758 F.2d at 1194.

In the present case, the Winsbergs primarily complain of emotional distress resulting from the destruction of their business, which would not be allowed under the rationale of *Kush*, though on appeal they point to incidental conduct suffered individually, including several wasted business trips between McAllen and Chicago to reclaim property held by the bank, personal property wrongfully held at the Chicago premises, salary limitations prior to calling the note imposed on the Winsbergs by the bank as part of the on-going financial relationship, and a demand made by the bank on the individual guarantee agreement made by the Winsbergs. To the extent that these acts against the Winsbergs individually caused them injury, they would have standing to sue the Bank in their individual capacities. Our inquiry then becomes whether any of these acts has been sufficiently proven to have caused the Winsbergs emotional distress compensable under Illinois law.

To recover for intentional infliction of emotional distress, a plaintiff must prove by a preponderance of the evidence that: (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress that the plaintiff suffered was severe; and (3) the defendant's conduct was such that the defendant knew that severe emotional distress would be certain or substantially certain to result. *Public Finance Corp. v. Davis*, 66 Ill.2d 85, 4 Ill. Dec. 652, 654, 360 N.E.2d 765, 767 (1976); *Owens v. Second Baptist Church of La Grange*, 163 Ill.App.3d 442, 114 Ill.Dec. 557, 561, 516 N.E.2d 712, 716 (1 Dist.1987). Although fright, horror, grief, shame, humiliation, and worry may fall within the ambit of emotional distress, these mental conditions alone are not actionable. The law intervenes only when the distress inflicted is so severe that no reasonable man could be expected to endure it. *Public Finance Corp.*, 4 Ill.Dec. at 654, 360 N.E.2d at 767; *Owens*, 114 Ill.Dec. at 561, 516 N.E.2d at 716. Distress of this severity may be brought on, for example, by a pattern of harassment or coercion involving extreme, continuous and threatening demands. *See Grey v. First National Bank of Chicago*, 169 Ill.App.3d 936, 120 Ill.Dec. 227, 232, 523 N.E.2d 1138, 1143 (1 Dist. 1988); *McGrath v. Fahey*, 163 Ill.App.3d 584, 117 Ill.Dec. 304, 520 N.E.2d 655 (1987).

The emotional distress testified to by the Winsbergs supposedly resulted from the destruction of their family business. There was no evidence to show that the wasted trips, withholding by the bank of undisclosed personal property, or salary limitations caused the Winsbergs severe distress. Additionally, Illinois law would not sanction a recovery for infliction of emotional distress resulting from a mere demand letter based on the individual guarantees of the Winsbergs, even though this may have added to the Winsbergs' uneasiness about being pursued on their debt to the bank. Applying Illinois law, we hold that as a matter of law merely putting the Winsbergs on notice that the Bank sought payment of a debt, even if that debt was incorrect or otherwise uncollectible, could not have inflicted distress so severe that no reasonable man could be expected to endure it. *See Grey*, 120 Ill.Dec. at 232, 523 N.E.2d at 1143; *Owens*, 114 Ill.Dec. at 561, 516 N.E.2d at 716. Points thirty and thirty-two through thirty-four are sustained.

By its sixty-fourth point of error the Bank complains of the award of exemplary damages when actual damages were not awarded or cannot be sustained. Under both Texas and Illinois law, the recovery of punitive damages is not allowed absent proof of actual damages resulting from a distinct underlying tort. *Nabours v. Longview Savings and Loan Association*, 700 S.W.2d 901, 905 (Tex.1985); *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 545 (Tex.App.—Corpus Christi 1989, *writ*

denied); *Florsheim v. Travelers Indemnity Co.*, 75 Ill.App.3d 298, 30 Ill.Dec. 876, 393 N.E.2d 1223 (1979); *Rhodes v. Uniroyal, Inc.*, 101 Ill.App.3d 328, 56 Ill.Dec. 834, 836, 427 N.E.2d 1380, 1382 (3 Dist.1981). In the present case, based on our disposition of the Bank's points concerning the underlying causes of action sounding in tort, we sustain its sixty-forth point concerning the awards of punitive damages.

By points of error seventy-six and seventy-seven the Bank challenges the legal and factual sufficiency of the evidence to support the jury's finding that it failed to sell the collateral in a commercially reasonable manner, and contends that the evidence conclusively established a commercially reasonable sale. The Bank's concern with the jury's finding on the commercial reasonableness of the sale relates to their claim for a recovery of the deficiency between the amount received at the sale and the amount still owed on the note, which the parties stipulated to be $267,499.00.

Finding that a sale was commercially unreasonable creates a rebuttable presumption that the value of the collateral was equal to the indebtedness, and thus precludes recovery of a deficiency unless the creditor can prove that the value of the collateral equalled the sale price. *Standard Bank & Trust Co. v. Callaghan*, 177 Ill.App.3d 973, 127 Ill.Dec. 186, 190, 532 N.E.2d 1015, 1019 (2 Dist.1988); *Ford Motor Credit Co. v. Jackson*, 126 Ill.App.3d 124, 81 Ill.Dec. 528, 530, 466 N.E.2d 1330, 1332 (3 Dist.1984); *see also First Galesburg National Bank & Trust Co. v. Joannides*, 103 Ill.2d 294, 82 Ill.Dec. 646, 469 N.E.2d 180 (1984). Therefore, in the present case, since the Bank did not conclusively prove that the value of the collateral equalled the sale price, its recovery of a deficiency depends upon the commercial reasonableness of its sale of the collateral.

Section 9–504(3) of the Illinois Uniform Commercial Code requires that every aspect of a sale be commercially reasonable, including the method, manner, time, place and terms. *See Standard Bank & Trust Co. v. Callaghan*, 177 Ill. App.3d 973, 127 Ill.Dec. 186, 189, 532 N.E.2d 1015, 1018 (2 Dist.1988); *Ford Motor Credit Co. v. Jackson*, 126 Ill.App.3d 124, 81 Ill.Dec. 528, 530, 466 N.E.2d 1330, 1332 (3 Dist.1984). In addition, while the price received at a sale does not alone show the commercial reasonableness of the sale, it is a key component in assessing the commercial reasonableness. *Callaghan*, 127 Ill.Dec. at 189, 532 N.E.2d at 1018. Whether a sale is commercially reasonable under this standard is a question for the trier of fact. *Callaghan*, 127 Ill.Dec. at 190, 532 N.E.2d at 1019; *Jackson*, 81 Ill. Dec. at 530, 466 N.E.2d at 1332.

The evidence shows that the Bank took possession of both collateral and non-collateral assets which it sold to A Complete Uniform Company for $250,000 at a private sale. This is significantly less than the value of the inventory as estimated by Joe Winsberg at various times in his testimony between $450,000 and $600,000. Along with this evidence of a sale price significantly below the market value of the inventory, the jury could infer from Winsbergs' testimony that the Bank failed to cooperate with him in finding a buyer for the collateral at a reasonable price, and the unusual nature of the actual sale, which privately disposed of both collateral and non-collateral assets as a package deal to A Complete Uniform Company, that it was not conducted in a commercially reasonable manner. We find the evidence legally and factually sufficient to support the jury's finding on commercial unreasonableness and to deny the Bank's claim for a deficiency. Points of error seventy-six and seventy-seven are overruled.

The Bank's remaining points of error are not dispositive and we do not address them. *See* Tex.R.App.P. 90(a). The judgment of the trial court awarding damages against State National Bank is REVERSED and judgment is here RENDERED that Academia and the Winsbergs take nothing from the Bank. The remainder of the judgment of the trial court, in so far as it denies the Bank's cause of action against appellees, is AFFIRMED.

OPINION ON MOTION FOR REHEARING

Academia complains on motion for rehearing that this Court erred in its presumption that the trial court applied Illinois law to the tort causes of action. In support of this complaint, Academia also moves for leave to file a supplemental transcript showing the trial court's order that Texas law be applied to the tort causes of action. The Bank admits in its response that the trial court found Texas law applicable to the tort actions. However, our presumption was by no means dispositive of the appeal or of our application of Illinois law to the Bank's no evidence points. Whether the trial court applied the correct law or not, the Bank's no evidence points correctly argued the applicability of Illinois law to the tort causes of action, relied upon Illinois cases and complained of Academia's failure to establish the various causes of action under Illinois law.

Academia now complains for the first time that the Bank did not raise a point of error specifically attacking the trial court's decision to apply Texas law to the tort causes of action. However, we will indulge a liberal construction of the briefing rules in favor of the sufficiency of the brief, and give effect thereto if we, from an examination of the statement under each point, can determine with some degree of certainty the nature of the complaint raised by the point. *Rio Delta Land Co. v. Johnson*, 566 S.W.2d 710, 713 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.); Tex. R.App.P. 74. The Bank clearly did raise its complaint that Illinois law, rather than Texas law, applied to the tort causes of action by its extensive arguments concerning the applicability of Illinois law and the application of Illinois law and cases to the present tort causes of action. [Even Academia determined the nature of the Bank's complaint, as its own appellate brief joined issue on the Bank's choice of law argument and cited Illinois law in response to the Bank's challenges to the sufficiency of the evidence to support the tort causes of action.]

In addition, where the error specifically addressed in appellant's brief is so inextricably entwined with another error that one cannot be mentioned without automatically directing attention to the other, the brief sufficiently directs the court's attention to both. *Consolidated Engineering Co. v. Southern Steel Co.*, 699 S.W.2d 188, 192 (Tex.1985). In the present case, the complaints raised in the Bank's brief that there was no evidence to support the tort causes of action under Illinois law were inextricably entwined with its complaint that the tort causes of action were subject to Illinois law rather than Texas law.

Although Academia has for the first time brought to this Court's attention a trial court ruling which was not part of the record at the time of our October 31, 1990 opinion, such ruling would not affect our decision that Illinois law was applicable in determining the Bank's points of error. Therefore, we overrule Academia's motion for rehearing and deny leave to file the supplemental transcript.

KEYS, J., not participating.