JOHN P. GREY, Plaintiff-Appellant, v. FIRST NATIONAL BANK OF CHI-CAGO *et al.*, Defendants-Appellees.

First District (4th Division)   No. 87—0479

Opinion filed May 5, 1988.

Rick Allan White, of Chicago, for appellant.

Peter J. Kilchenmann, Lynn A. Goldstein, and Jones, Ware & Grenard,

all of Chicago (Mitchell Ware, Martin P. Greene, and David S. Allen, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

Plaintiff, John P. Grey, filed a two-count complaint against his former employer and supervisor, First National Bank of Chicago and Daniel Wroblewski, respectively. Count I attempts to state a cause of action in "constructive retaliatory discharge," and count II sounds in intentional infliction of emotional distress.

The trial court granted defendants' motion for summary judgment on count II and dismissed count I for failure to state a cause of action.

On appeal, Grey contends that he was virtually forced to quit his job, because of defendants' misconduct, and that this court should recognize the tort of constructive retaliatory discharge. In addition, Grey argues that genuine issues of material fact precluded the summary judgment entered against him as to count II.

We affirm the trial court.

BACKGROUND

Grey was employed full time by the First National Bank of Chicago from January 16, 1968, until September 14, 1979. His duties as a legal analyst with the trust department of the bank included the processing of various trust documents for review by the bank's attorneys.

Grey's immediate supervisor from 1976 until his termination in 1979 was Daniel Wroblewski. According to the allegations of Grey's complaint, Wroblewski caused him to resign by harassing him in retaliation for Grey's opposition to the bank's filing an allegedly perjured affidavit in a Federal class action. The affidavit purported to excuse the bank's untimely submission of claims on behalf of certain trust accounts. Wroblewski also allegedly mistreated minority and handicapped employees.

According to Grey, in March 1978 he was approached by another employee whose responsibility it was to mail proofs of claim to the Federal court in California in connection with the class action. This employee, Linda Matsler, told Grey of her concern as to the timeliness of the claims because she thought a deadline had expired. Approximately a month later, Grey saw one of the bank's attorneys, Helen Hahne, repeatedly place a document on Matsler's desk, apparently requesting her to sign it, which Grey did not observe Matsler do while he was watching.

Matsler was relieved of her responsibility for the class action assignment in May or June 1978. She complained to Grey that she was being overburdened with work assignments, which included filing of dockets in cabinets over five feet off the ground. Matsler stood 4 feet 10 inches and had a crippled leg. In August 1978 Matsler left the bank to attend law school.

In the summer of 1978, plaintiff's mother was hospitalized for two weeks because of a heart attack. Grey told Wroblewski that he was upset because it was his mother's second heart attack and his father had previously died from a heart attack and stroke. Both parents suffered from hypertension and Grey believed he was a good candidate for that condition also. Wroblewski suggested that he take some time off, which he did.

In November 1978 Grey found a notice indicating that the bank's claim on behalf of certain trust accounts had been rejected in the California class action for failure to timely submit proof of authority. Grey also discovered an unexecuted affidavit prepared for Hahne's signature in connection with a motion to reconsider a court order in the class action. Grey believed that portions of the affidavit, which dealt with the mailing of the proof of authority, were false. He believed that Hahne had submitted a perjured affidavit to the Federal district court after she could not obtain Matsler to sign a false affidavit. However, he had no firsthand knowledge of the matters in the affidavit and did not talk to Matsler about the affidavit until mid-December 1978. Ultimately, Grey obtained a certified copy of the memorandum that the bank had filed in the California class action, which sought to excuse the late filing of the trust claims based in part on Hahne's affidavit. The total amount of claims, which belonged to the trust beneficiaries, was $160,539.73.

Grey's initial confrontation with Wroblewski occurred in November 1978. Wroblewski assigned Grey the responsibility for the class action assignments previously handled by Matsler. Grey refused, stating that he did not want to do so until the Hahne affidavit matter was "cleared up." Grey also told Wroblewski that he objected to the way Matsler had been treated after allegedly refusing to sign Hahne's affidavit. Grey further informed his supervisor that he intended to bring these matters to the attention of the personnel department. According to Grey, Wroblewski replied that Grey was not going to "taint" his department.

In early December 1978, Wroblewski notified Grey that he was not in compliance with the dress code of the bank. He gave Grey approximately one week to conform to the code before he would insti-

tute disciplinary action. That deadline was extended because of Grey's representation that he had to special order his shoes, which would take a month or two to receive. Grey was to furnish proof of purchase to Wroblewski. Grey offered a cash register receipt in the amount of $5, which he claimed was the deposit on the order. Wroblewski rejected the receipt as inadequate proof that Grey had actually purchased or ordered the new shoes and gave him until December 29 to furnish the requested proof.

Although Grey offered another receipt on December 29, it failed to indicate when the shoes would be delivered. Wroblewski then obtained Grey's permission to telephone the shoe store. Based on what the store's manager told Wroblewski, he concluded that Grey had not been altogether forthcoming in his representations and further concluded that Grey had failed to furnish proof that he in fact had ordered the necessary shoes. Accordingly, on January 16, 1979, Wroblewski read Grey a memorandum notifying him of his conclusion that Grey had failed to conform to the proof of purchase requirement and giving Grey another 30 days to either obtain different shoes or secure the ordered pair. When Grey finally obtained the shoes, the disciplinary proceeding involving the dress code violations was concluded.

A second disciplinary proceeding had been initiated, however, arising out of Grey's alleged misrepresentations over the shoes. In February of 1979, Grey was conditionally discharged from this disciplinary proceeding.

The bank instituted two other disciplinary proceedings against Grey, which arose out of Grey's excessive absenteeism and the quantity and quality of his work.

In December 1978 Wroblewski notified Grey that in his performance for the month of November, Grey had failed to meet the required production standard of 80 items of work per month. He had completed only 59 items. In December, Grey produced 78 items. Wroblewski told Grey that he would monitor Grey's work for the next quarter, January through March of 1979.

In early January 1979, during the shoe controversy, Grey had a nervous breakdown. He was trembling and registered high blood pressure readings. After several days of bed rest, he returned to work. Wroblewski told him he thought Grey had removed certain objects from Wroblewski's desk. Grey reported the incident and went to see the bank's doctor because of chest pains. The doctor sent him home because of elevated blood pressure. Grey saw his own physician and did not return to work until January 16, when Wroblewski read

him several memos concerning various disciplinary matters. Grey took additional days off work because of his physical condition.

In February 1979, Wroblewski met with Grey to discuss his absenteeism. After informing Grey that he had missed 16 full days and four partial days out of a total 34 working days since January 1, 1979, Wroblewski gave Grey 30 days to substantially improve his attendance record. Thereafter, Grey's attendance improved and this disciplinary action progressed no further.

In April 1979, Wroblewski again met with Grey to discuss the quantity of his work. Grey's production total for each of the three months was again below the mark by 15 to 20 items per month. Accordingly, Wroblewski told Grey that he would monitor his work for the next quarter.

At the end of the quarter, Grey's totals were 49, 28, and 72, again below the 80-item requirement. Grey asserted that he did not meet the production standard because almost all of his work was taken from him in February or March of 1979 and no new work was assigned to him. He also charged that the work he did complete was sitting on a reviewer's desk and he was not getting credit for them. He continued to complain of this situation throughout the next quarter.

Wroblewski gave Grey another quarter to improve his production. He informed Grey in a memorandum that if he did not bring his production up to standard during the months of July, August, and September 1979, Wroblewski would recommend his dismissal.

In July, Grey completed in excess of 100 items. However, in August his total was again below the standard. In September, Wroblewski told Grey that his August total was below standard but did not advise him that he would be discharged. Grey apparently believed that he would be terminated anyway, and he submitted his resignation on September 14, 1979.

In May 1982, Grey filed the pending action. In April 1986, after substantial discovery, defendants moved for summary judgment on both counts of the amended complaint. On July 9, 1986, the trial court dismissed the constructive retaliatory discharge claim, *sua sponte*, and granted defendants' motion for summary judgment as to intentional infliction of emotional distress.

OPINION

I

■ Grey asks this court to recognize a cause of action for con-

structive retaliatory discharge, which he does not specifically define. We presume that the only difference between this tort and retaliatory discharge[1] is that in the former case, the employer "forces" the employee to quit, rather than actually discharge him. The theory is easy enough to grasp; the application is not.

In the pending case, Grey was not discharged from his job. Nor was he told to resign, as was the situation in the one Illinois case in which the concept of forced resignation was held to suffice for the discharge element. (*Hinthorn v. Roland's of Bloomington, Inc.* (1987), 151 Ill. App. 3d 1006, 1009, 503 N.E.2d 1128, *aff'd* (1988), 119 Ill. 2d 526, 519 N.E.2d 909.

In *Hinthorn*, plaintiff alleged that she had sustained back injuries at work for which she had made a claim; that her employer told her she had been getting injured too often and that she must sign a "voluntary resignation" form; that she did not fully understand the form but knew that she would be fired if she did not sign it; and that her employer forced her to sign the form in retaliation for seeking workers' compensation medical benefits. The trial court dismissed the complaint for failure to state a cause of action, relying on a decision of the Fourth District Appellate Court, *Scheller v. Health Care Service Corp.* (1985), 138 Ill. App. 3d 219, 485 N.E.2d 26, which refused to extend the tort of retaliatory discharge to a situation in which the employee alleged that she was constructively discharged because the employer had purposely made her employment unbearable.

The same district of the appellate court that decided *Scheller* distinguished its facts from those alleged in *Hinthorn*, however, and ruled that the plaintiff had not exercised free will in resigning, since she signed the form under threat of discharge. The *Hinthorn* court stood by its holding in *Scheller* that the alleged "constructive" discharge of an employee through a pattern of harassment is *not* sufficient to fit within the retaliatory discharge tort. (*Hinthorn*, 151 Ill. App. 3d at 1008-09.) Although expressing some concern for harassment-related resignations, the *Hinthorn* court noted that substantial differences exist between the *Scheller* situation and that of a "weaker willed and less sophisticated" employee who is *told* to resign in retaliation for exercising rights protected by public policy. "When the resignation is motivated by harassment, the situation is

---

[1]There are three elements necessary to state a cause of action for retaliatory discharge: (1) the employee was discharged; (2) the discharge was caused by or in retaliation against the employee's activities; and (3) the discharge violates a clear mandate of public policy. *Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, 519 N.E.2d 909.

more complex with less certainties of proof, and the conduct of the employer is more attenuated from the resignation than, as here, where the employer is alleged to have told the employee to resign. The danger of an employer undertaking a course of harassment to retaliate against an employee is much less than merely demanding the resignation. On the other hand, the danger to the employer of false claims are [*sic*] much less when the discharge element of the tort is based on a demand for resignation by the employer than when it is based on harassment." 151 Ill. App. 3d at 1008-09, 503 N.E.2d at 1130.

The Illinois Supreme Court affirmed the appellate court in *Hinthorn*, concluding that the plaintiff had adequately alleged a cause of action in retaliatory discharge, but making it "abundantly clear that [the court was] not now endorsing the constructive discharge concept rejected by the appellate court in *Scheller*." (119 Ill. 2d at 530-31, 519 N.E.2d at 912.) The Illinois Supreme Court did not rule upon the viability of the constructive discharge theory in relation to the facts before it because it found that "plaintiff allege[d] that she was actually and not constructively discharged." (119 Ill. 2d at 531, 519 N.E.2d at 912.) In so finding, the court relied on the allegation that the defendant essentially told the plaintiff to seek work elsewhere after she requested medical attention. Plaintiff was given the clear message that she was being discharged and her execution of the "voluntary resignation" form was coerced. Had she refused to sign she would have been discharged anyway.

As previously noted, the facts before us do not indicate that Grey was actually discharged or that he was told to resign. The bank had a fairly detailed and lengthy administrative process that it appears to have followed in instituting disciplinary action against Grey. Grey does not deny that he was given abundant notice of his alleged violations of bank policy, orally and in writing, every step of the way. This court does not sit in review of the internal disciplinary proceedings of the bank and we need not express an opinion as to the alleged harassing nature of the proceedings. As the trial court noted, "there is little doubt that [Grey's] version of these events as set forth in his deposition testimony and his affidavit arguably presents an issue of fact on the question of [defendants'] motivation for instituting disciplinary action against the plaintiff, and whether the discipline was, in fact, well grounded." Nevertheless, the trial court was bound, as we are, by existing Illinois law. We must follow the reasoning of *Scheller*, approved in *Hinthorn*, which found that "constructive discharge is not an actionable concept" in regard to retaliatory

discharge.[2] *Scheller v. Health Care Service Corp.* (1985), 138 Ill. App. 3d 219, 223, 485 N.E.2d 26, 30.

We conclude that Grey has failed to state an actionable claim of constructive retaliatory discharge and that the trial court's dismissal of count I of the complaint was proper.

Because of our holding that the discharge elements is lacking we need not consider whether Grey adequately alleged the other elements of retaliatory discharge, *i.e.*, whether the discharge was in retaliation for the employee's activities and whether the discharge violated a clearly mandated public policy.

## II

The second issue on appeal is whether the trial court erred in granting summary judgment in favor of defendants on count II of the complaint, which sounds in intentional infliction of emotional distress.

█ The elements of this tort are as follows: The defendant's conduct is extreme and outrageous, causing the plaintiff severe emotional distress such that defendant knew that his acts would be substantially certain to cause severe emotional distress. (*Owens v. Second Baptist Church* (1987), 163 Ill. App. 3d 442, 448, 516 N.E.2d 712.) This standard is so stringent that it is met only if the distress inflicted is so severe that no reasonable person could be expected to endure it. *E.g., Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767.

The facts that have met this tough pleading standard have included a coercive factor, such as an employer's attempt to cause the employer to commit an illegal act (*Milton v. Illinois Bell Telephone Co.* (1981), 101 Ill. App. 3d 75, 427 N.E.2d 829) or the existence of a pattern of harassment involving extreme and continuous calls and letters of a threatening and profane or obscene nature (*Sherman v.*

---

[2]Some confusion may arise from the Illinois Supreme Court's characterization of *Hinthorn* as involving "actual," rather than "constructive," retaliatory discharge, although from the context it is evident the *Hinthorn* plaintiff's "resignation" was not voluntary in any sense of the word. Hence, it was not a resignation at all, but a true discharge. In contrast, *Scheller* and the instant case both involve a voluntary act of resignation, even though the respective plaintiffs may well have felt that their very health and well-being was on the line.

While this court certainly does not condone alleged harassment of employees, we are bound to follow the supreme court's lead in the retaliatory discharge arena. In addition to its recent comments in *Hinthorn*, the court has previously indicated that it is not in favor of expanding the tort. *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 478 N.E.2d 1354.

*Field Clinic* (1979), 74 Ill. App. 3d 21, 392 N.E.2d 154). Neither situation is involved in the pending case.

Grey cites the recent opinion of *McGrath v. Fahey* (1987), 163 Ill. App. 3d 584, as support for his contention that the bank's alleged conduct constituted intentional infliction of emotional distress. In *McGrath*, the plaintiff, owner of certain real estate, contracted to sell the property to defendant owner of a bank. The parties subsequently accused each other of fraud. Plaintiff then attempted to remove $1 million worth of certificates of deposit he had in the bank, which he held in trust for third parties. The bank refused to release the certificates because of the dispute over the sales transaction. Plaintiff advised the bank of his heart condition and told the bank's attorney that he was becoming extremely anxious about the matter. The bank's attorney told plaintiff that he must assign to the bank his interest in certain second mortgages held in connection with the contract, and, if he refused, the bank would financially ruin him and his medical practice.

Plaintiff suffered a massive heart attack and underwent open heart surgery.

Thereafter, the bank continued for a time to refuse the transfer of the certificates of deposit. After the certificates were transferred, however, the bank dishonored eight drafts drawn against various accounts that were owned by plaintiff, his wife, his business, and a trust account. In addition, the bank telephoned plaintiff, over his objection, several times while he was recovering from the surgery. The bank also filed suit against him and sent him a letter stating that the bank was setting off plaintiff's accounts against the amount it claimed to be due in its lawsuit against plaintiff.

The *McGrath* court reasoned that whether or not defendants' conduct constituted intentional infliction of emotional distress before the heart attack was "arguable." (163 Ill. App. 3d at 590.) Afterwards, however, the bank's conduct "was certain or substantially certain to cause plaintiff severe emotional distress in light of the seriousness of his health." 163 Ill. App. 3d at 590.

The *McGrath* situation is easily distinguishable from that in the case before us. The pattern of conduct that the bank used against the plaintiff was designed to coerce him to assign his second mortgages. The bank's overreaching and abuse of fiduciary responsibility was particularly specious when it continued after it knew of plaintiff's open heart surgery. The bank had no legal right to withhold the certificates, dishonor the drafts drawn on the accounts, or apply as a setoff against plaintiff's alleged liability the funds that plaintiff held

as trustee for third parties. Accordingly, the court reversed the dismissal of the complaint for failure to state a cause of action.

■■ In the present case, the bank was not extorting Grey or attempting to ruin him financially. Regardless of its motivation, the bank did follow its internal policies and procedures for the disciplinary proceedings. In addition, defendants appear to have given Grey time off for his illness and did not penalize him for the absenteeism.

The courts have recognized that questioning of job performance and personality conflicts are unavoidable aspects of employment and that stress is often the result; however, such stress cannot form the basis of the tort of intentional infliction of emotional distress or virtually every employee would have a cause of action. (*E.g., Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137; *Owens v. Second Baptist Church* (1987), 163 Ill. App. 3d 442, 516 N.E.2d 712. See also *Harris v. First Federal Savings & Loan Association* (1984), 129 Ill. App. 3d 978, 473 N.E.2d 457 (plaintiff who was criticized, demoted, and ultimately discharged after reporting alleged criminal activity to her supervisor did not state a cause of action, since she did not allege that her employer's conduct was calculated to cause her to engage in illegal activity).) We conclude that the trial court did not err in granting defendants' motion for summary judgment on count II of the complaint.

For the foregoing reasons, we affirm the decision of the trial court in its entirety.

Affirmed.

JOHNSON and McMORROW, JJ., concur.