WENDY WHITT, Plaintiff v. HARRIS TEETER, INC., and RANDY SHULTZ, Defendants

No. COA03-335

(Filed 6 July 2004)

**Employer and Employee— wrongful discharge—sexual harassment—constructive discharge**

The trial court erred by granting a directed verdict for defendant on a claim for constructive wrongful discharge in violation of public policy based upon sexual harassment. Such a claim exists in North Carolina even though the discharge is constructive, and plaintiff presented sufficient evidence to survive a motion for a directed verdict.

Judge McCullough dissenting.

Appeal by plaintiff from judgment entered 2 April 2002 by Judge Sanford L. Steelman, Jr. in Superior Court, Forsyth County. Heard in the Court of Appeals 13 January 2004.

**WHITT v. HARRIS TEETER, INC.**

[165 N.C. App. 32 (2004)]

*Kennedy, Kennedy, Kennedy & Kennedy, L.L.P., by Harvey L. Kennedy and Harold L. Kennedy, III, for plaintiff appellant.*

*Womble Carlyle Sandridge & Rice, PLLC, by Lucretia D. Guia and J. Mark Sampson, for defendant appellee Harris Teeter, Inc.*

WYNN, Judge.

Plaintiff Wendy Whitt appeals from final judgment of the trial court entered upon directed verdict in favor of Defendant Harris Teeter, Inc. Plaintiff argues she presented sufficient evidence that Defendant terminated her employment in violation of public policy, and that the trial court therefore erred in granting directed verdict to Defendant on her wrongful discharge claim. We conclude Plaintiff presented sufficient evidence to withstand Defendant's motion for directed verdict, and we therefore reverse the judgment of the trial court.

The pertinent facts of the instant appeal are as follows: On 20 November 2000, Plaintiff filed a complaint in Forsyth County Superior Court against Defendant and one of its employees, Randy Schultz. The complaint alleged that Schultz sexually harassed Plaintiff during her employment with Defendant, and that Defendant failed to take appropriate action to protect Plaintiff from such misconduct. Plaintiff further alleged that after she reported the sexual harassment, Defendant took retaliatory action against her, resulting in her eventual termination. Plaintiff set forth claims against Defendant for (1) intentional infliction of emotional distress; (2) negligent retention and supervision; (3) wrongful discharge in violation of public policy based on retaliation; and (4) wrongful discharge in violation of public policy based upon a hostile workplace environment.

Plaintiff's case came for trial on 11 February 2002. In support of her claim for wrongful discharge, Plaintiff presented the following evidence: Plaintiff worked as a cashier at Defendant's grocery store in Kernersville, North Carolina. Schultz, a fellow employee at the grocery store, began sexually harassing Plaintiff in July of 1999. Specifically, Schultz approached Plaintiff at her cash register several times per day on a daily basis and whispered in her ear such statements as:

1. "Let's go get naked and rub down in baby oil."

2. "That bright polish you're wearing is giving me a hard-on."

3. "I bet you could f—k like hell when you're that mad."

4. "If I catch you bent over like that again I might have to come and throw my rod."

5. "If I'm Santa Claus, I have a lifetime lollipop when you want to sit on my lap."

Plaintiff could feel Schultz's lips touching her ear as he made these comments. Plaintiff informed Schultz she was married, asked him to stop, and told him she thought he was "sick." Schultz persisted in his objectionable behavior toward Plaintiff.

Plaintiff testified that, whenever possible, she "would push [Schultz] off and try to move away from him." Plaintiff could not always avoid Schultz, however, as he sometimes approached her while she assisted customers. Another cashier, Nell Williamson, regularly observed Schultz "leaning over up on [Plaintiff] and talking in her ear." Williamson testified Plaintiff "would pull away or push the groceries down [the] side to get him away from her. If she didn't have any customers, she would turn around and walk off." According to Plaintiff, Schultz's actions humiliated and degraded her and made her feel "helpless [and] trashy."

In October of 1999, Schultz approached Plaintiff from behind while she was standing near the time clock and "took his hand down the back of [her] back down over [her] bra, down to the top of [her] pants, and threatened [her]," by stating "I'll get you sooner or later." Following this incident, Plaintiff became "frightened" and informed her family of Schultz's behavior. After discussing the situation with her family, Plaintiff decided to report Schultz's behavior to management.

On 26 October 1999, Plaintiff informed her front-end manager, Jenny Poff, that Schultz had been sexually harassing her. Poff informed her that two other female employees had filed sexual harassment charges against Schultz, and she advised Plaintiff to contact the store manager, Mike Turner. Plaintiff met with Turner in his office later that afternoon, who told her "he would have to contact the Field Specialist, Shirley Morgan." Turner told Plaintiff "he was sorry that [she] had to go through this and that this type of behavior would not be tolerated." Turner did not ask Plaintiff for the details of the sexual harassment. Later that day, Plaintiff met with the field specialist, Shirley Morgan, who requested Plaintiff "write down the statements that had been said, the remarks" and informed

**WHITT v. HARRIS TEETER, INC.**

[165 N.C. App. 32 (2004)]

her there would be an investigation, stating the store did "not tolerate this type of behavior."

Despite these meetings, Schultz continued making sexual comments to Plaintiff over the next several days. One week later, Schultz was promoted and entered a manager trainee program at a different store location in Charlotte, North Carolina. However, Schultz continued to regularly visit the Kernersville store and harass Plaintiff by whispering sexual remarks in her ear, winking at her, and licking his lips. Schultz told Plaintiff, "I'll get you sooner or later" and "The green polish you're wearing is making me horny." On several occasions, Schultz followed Plaintiff to her home. As a result, Plaintiff's father, Jack Hodge, began accompanying Plaintiff to and from work. Hodge testified he observed Schultz following his daughter home on three occasions. Plaintiff met again with Turner and informed him of the continued harassment. She also informed Turner that Schultz had followed her home and had threatened her. Turner told Plaintiff "Well, as far as I know he's not been banned from the store." Turner informed Plaintiff he would contact Morgan, the field specialist.

Later in November, Morgan met with Plaintiff and informed her that the investigation was over, that Schultz had denied everything, and that she could not corroborate Plaintiff's allegations. Morgan gave Plaintiff a copy of Defendant's sexual harassment policy. Morgan did not discuss the details of her investigation with Plaintiff, nor did she acknowledge or discuss the continued additional instances of harassment of which Plaintiff had informed Turner.

Following her meeting with Morgan, Plaintiff arranged to have a third meeting with Turner, which both Plaintiff's father and the store's assistant manager, Mike Streicher, attended. After informing Turner that Schultz was still making the sexual comments, stalking her, following her home, physically touching her and making threatening phone calls, Turner replied, "harsh[ly] and unconcerned, 'Wendy, what do you want me to do about it?' " Her father then asked Turner, "What are you going to do about it?" Turner "just raised up in his seat and stared out the front out of the glass window of his office."

Plaintiff testified Schultz again approached her in November as she stood at the store's time clock. He pressed his entire body tightly against Plaintiff, reached around her and attempted to touch her breasts. Before he could touch her breasts, Plaintiff "slung him off." Instead of going to Turner, Plaintiff contacted the field specialist directly. She told Morgan the sexual harassment was

**WHITT v. HARRIS TEETER, INC.**

[165 N.C. App. 32 (2004)]

continuing and described the threats and stalking. Morgan informed her that the matter had been "thoroughly investigated" and the investigation was complete. Morgan offered no further assistance. As a result, Plaintiff filed a complaint with the Equal Opportunity Employment Commission.

Between the third week of November 1999 and the end of December 1999, Defendant reduced Plaintiff's employment hours from thirty-seven hours to twenty-seven hours per week. Schultz continued to visit the store in December, making sexually offensive comments to Plaintiff several times per week. By this time, Plaintiff was experiencing panic attacks, crying spells, suicidal thoughts, depression, withdrawal, insomnia, nightmares, nervousness and felt "hopeless, helpless, and just totally degraded." She was "an emotional basketcase." Plaintiff sought medical treatment and was prescribed Prozac and Xanax. Her condition worsened, however, causing Plaintiff to resign from her position with Defendant in February of 2000. Upon giving her notice of resignation to the assistant manager, he stated "Well, we figured this is going to happen."

At the close of the evidence, the trial court granted Defendant's motion for a directed verdict on Plaintiff's wrongful discharge claim pursuant to Rule 50(a) of the North Carolina Rules of Civil Procedure. On 27 February 2002, the jury rendered a verdict finding that Defendant was not liable for intentional infliction of emotional distress and negligent retention, and the trial court entered judgment accordingly. Plaintiff appealed.

---

Plaintiff contends the trial court improperly granted Defendant's motion for directed verdict in that she presented more than a "scintilla" of evidence to support her claim. For the reasons stated herein, we agree that directed verdict was improperly granted, and we reverse the judgment of the trial court.

It is well established in North Carolina that in determining whether the evidence is sufficient to withstand a motion for a directed verdict, "the plaintiff's evidence must be taken as true and all the evidence must be viewed in the light most favorable to her, giving her the benefit of every reasonable inference which may be legitimately drawn therefrom, with conflicts, contradictions, and inconsistencies being resolved in the plaintiff's favor." *Bryant v. Thalhimer Brothers, Inc.*, 113 N.C. App. 1, 6, 437 S.E.2d 519, 522 (1993), *disc. review denied*, 336 N.C. 71, 445 S.E.2d 29 (1994). The trial court

**WHITT v. HARRIS TEETER, INC.**

[165 N.C. App. 32 (2004)]

should deny the motion for directed verdict if there is more than a scintilla of evidence to support all the elements of the plaintiff's *prima facie* case. *Id.* In reviewing the grant of a directed verdict pursuant to Rule 50(a) of the Rules of Civil Procedure, our task is to determine whether the evidence, taken in a light most favorable to the plaintiff, was sufficient for submission to the jury. *Stallings v. Food Lion, Inc.*, 141 N.C. App. 135, 136-37, 539 S.E.2d 331, 332 (2000). We must therefore determine whether Plaintiff presented sufficient evidence to support the elements of her claim for wrongful discharge in violation of public policy.

### I. *Wrongful Discharge in Violation of Public Policy*

In *Coman v. Thomas Manufacturing Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989), our Supreme Court adopted a public policy exception to the employee-at-will doctrine. Although at-will employment may be terminated " 'for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent.' " *Id.* at 175, 381 S.E.2d at 447 (quoting *Sides v. Duke University*, 74 N.C. App. 331, 342, 328 S.E.2d 818, 826, *disc. review denied*, 314 N.C. 331, 333 S.E.2d 490 (1985), *overruled in part on other grounds, Kurtzman v. Applied Analytical Industries, Inc.*, 347 N.C. 329, 493 S.E.2d 420 (1997)). To state a claim for wrongful discharge in violation of public policy, an employee has the burden of pleading that his "dismissal occurred for a reason that violates public policy." *Considine v. Compass Grp. USA, Inc.*, 145 N.C. App. 314, 317, 551 S.E.2d 179, 181, *affirmed per curiam*, 354 N.C. 568, 557 S.E.2d 528 (2001). "Public policy has been defined as the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good." *Coman*, 325 N.C. at 175 n.2, 381 S.E.2d at 447 n.2. Although this definition of public policy "does not include a laundry list of what is or is not 'injurious to the public or against the public good,' at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992) (footnote omitted).

There is no question that "the right to be free of sexual harassment in the workplace . . . is implicated in our State declaration of public policy." *Guthrie v. Conroy*, 152 N.C. App. 15, 19-20, 567 S.E.2d

403, 407 (2002); *see also* N.C. Gen. Stat. § 143-422.2 (2003) (declaring that "[i]t is the public policy of this State to protect . . . the right . . . of all persons to seek, obtain and hold employment without discrimination or abridgement on account of . . . sex"); *Russell v. Buchanan*, 129 N.C. App. 519, 500 S.E.2d 728 (employee suit alleging wrongful discharge in violation of Title VII and North Carolina public policy), *disc. review denied*, 348 N.C. 501, 510 S.E.2d 655 (1998). Our Supreme Court has ruled that the "ultimate purpose of . . . G.S. 143-422.2 and Title VII (42 U.S.C. 2000(e), *et seq.*) is the same," and thus the statute is co-extensive with the federal statute, evaluated under the same standards of evidence and principles of law. *Dept. of Correction v. Gibson*, 308 N.C. 131, 141, 301 S.E.2d 78, 85 (1983). Title VII prohibits sexual harassment in the workplace. *See* 42 U.S.C. § 2000(e)(2)(a)(1) (providing that "it shall be an unlawful employment practice for an employer to fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such person's gender"). Various state statutes provide protection against sexual harassment in the workplace and elsewhere. *See, e.g.*, N.C. Gen. Stat. § 143-422.2 (above); N.C. Gen. Stat. § 115C-335.5 (2003) (prohibiting retaliation by any local board of education member against an employee who reports sexual harassment); N.C. Gen. Stat. § 115C-325 (2003) (addressing sexual harassment by career education employees); N.C. Gen. Stat. § 14-395.1(a) (2003) (classifying sexual harassment as a Class 2 misdemeanor). A discharge based on sexual harassment therefore offends the public policy of this State and may properly support a wrongful discharge claim in violation of public policy. *Guthrie*, 152 N.C. App. at 19-20, 567 S.E.2d at 407; *Russell*, 129 N.C. App. at 521, 500 S.E.2d at 730; *see also Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 534 (4th Cir. 1991) (holding that North Carolina's public policy wrongful discharge doctrine was applicable to prohibit sexual harassment); *Phillips v. J.P. Stevens & Co., Inc.*, 827 F. Supp. 349, 352-53 (M.D.N.C. 1993) (recognizing wrongful discharge claim in violation of public policy on the basis of sexual harassment).

In the instant case, Plaintiff presented evidence tending to show that (1) she was sexually harassed in the workplace by a fellow employee; (2) she repeatedly reported such harassment to Defendant; (3) Defendant promoted the employee responsible for the sexual harassment; (4) the sexual harassment continued after Plaintiff reported the behavior to Defendant; (5) Defendant reduced Plaintiff's

employment hours by ten hours per week after she reported the harassment; (5) Plaintiff developed depression and other psychological conditions as a result of the sexual harassment, Defendant's failure to effectively address such harassment, and Defendant's actions following the report of sexual harassment; and (5) Plaintiff's condition ultimately forced her to resign from her employment with Defendant. We conclude Plaintiff presented sufficient evidence that her termination of employment was predicated upon sexual harassment in violation of public policy. We must now examine whether Plaintiff's evidence supports her claim that she was wrongfully discharged, where termination of employment was constructive rather than explicit.

## II. *Constructive Discharge*

Whether an at-will employee may be constructively discharged in contravention of the public policy of our State remains unsettled. *See Graham v. Hardee's Food Systems*, 121 N.C. App. 382, 385-86, 465 S.E.2d 558, 560-61 (1995) (indicating that although "North Carolina courts have yet to adopt the employment tort of constructive discharge," assuming *arguendo* such a claim exists, the plaintiff's evidence failed to establish an element of constructive discharge). In *Coman*, however, our Supreme Court implicitly recognized the viability of a wrongful discharge claim in violation of public policy where termination was constructive. The plaintiff-employee in *Coman* who refused to violate federal trucking regulations was not fired by his employer; rather, the employer reduced his salary by fifty percent. The *Coman* Court determined that the reduction in pay was "tantamount to a discharge" of the plaintiff, and went on to recognize the plaintiff's termination as a wrongful discharge in violation of public policy. *Id.* at 173-74, 381 S.E.2d at 446. After *Coman*, our Supreme Court ostensibly confirmed this interpretation of *Coman* in *Garner v. Rentenbach Constructors, Inc.*, 350 N.C. 567, 515 S.E.2d 438 (1999), by describing the plaintiff's termination in *Coman* as a "constructive discharge." *Id.* at 570, 515 S.E.2d at 440. Decisions by this Court have left open the possibility of a constructive discharge claim. *See, e.g., Doyle v. Asheville Orthopaedic Assocs., P.A.*, 148 N.C. App. 173, 177, 557 S.E.2d 577, 579 (2001) ("We recognize the viability of [the plaintiff's claim for constructive discharge] in the context of interpreting whether constructive termination by her employer triggered the termination payment provision of the employment contract."), *disc. review denied*, 355 N.C. 348, 562 S.E.2d 278 (2002); *Russell*, 129 N.C. App. at 524, 500 S.E.2d at 731-32 (affirming, although not directly

addressing, jury verdict for plaintiff who brought suit alleging wrongful constructive discharge in violation of Title VII and North Carolina public policy based on sexual harassment); *Graham,* 121 N.C. App. at 385-86, 465 S.E.2d at 560-61; *Wagoner v. Elkin City Schools' Bd. of Education,* 113 N.C. App. 579, 588, 440 S.E.2d 119, 125 (stating that, "[a]ssuming that plaintiff was wrongfully constructively discharged, she is nonetheless not entitled to assert the tort of wrongful discharge because the tort of wrongful discharge arises only in the context of employees at will."), *disc. review denied,* 336 N.C. 615, 447 S.E.2d 414 (1994).

Further support for the proposition that North Carolina recognizes the validity of wrongful discharge claims in violation of public policy where termination is constructive is found in the principles announced by our Supreme Court in the seminal case of *Coman.* As explained in *Coman,* an at-will employee may not be terminated for a reason violating the public policy of our State because " '[a] different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent.' " *Coman,* 325 N.C. at 175, 381 S.E.2d at 447 (quoting *Sides,* 74 N.C. App. at 342, 328 S.E.2d at 826). Moreover, our Supreme Court acknowledged in *Coman* that "[b]ad faith conduct should not be tolerated in employment relations, just as it is not accepted in other commercial relationships." *Id.* at 177, 381 S.E.2d at 448. Bad faith conduct by an employer, resulting in intolerable working conditions like those in *Coman,* should not be sanctioned merely because the termination of employment was constructive rather than explicit. As recognized elsewhere, "[a] coerced resignation is tantamount to a discharge." *Smith v. Brown-Forman Distillers Corp.,* 241 Cal. Rptr. 916, 920 (Cal. App. 1987).

"There is a growing willingness among courts to permit common law public-policy-based claims of constructive discharge." 1 Lex. K. Larson, *Unjust Dismissal* § 6.06[2] (2003). " 'Though not always employing precisely the same language, most courts seem to have adopted the rule that a constructive discharge occurs . . . when an employer deliberately causes or allows the employee's working conditions to become "so intolerable" that the employee is forced into an involuntary resignation.' " *Smith,* 241 Cal. Rptr. at 920 (quoting *Beye v. Bureau of National Affairs,* 59 Md. App. 642, 653, 477 A.2d 1197, 1203, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984)). Indeed, ten of the eleven states to consider whether such a claim is cognizable have extended the public policy exception to prohibit con-

structive discharge. *See id.; see also, e.g., Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 250, 743 S.W.2d 380, 386 (1988); *Smith,* 241 Cal. Rptr. at 920; *Seery v. Yale-New Haven Hospital,* 17 Conn. App. 532, 540, 554 A.2d 757, 761 (1989); *Balmer v. Hawkeye Steel,* 604 N.W.2d 639, 643 (Iowa 2000); *Beye,* 59 Md. App. at 653, 477 A.2d at 1203; *Bell v. Dynamite Foods,* 969 S.W.2d 847, 853 (Mo. Ct. App. 1998); *Barker v. State Ins. Fund,* 40 P.3d 463, 468 (Okla. 2001); *Dalby v. Sisters of Providence,* 125 Or. App. 149, 154, 865 P.2d 391, 394-95 (1993); *Slack v. Kanawha County Housing,* 188 W. Va. 144, 155, 423 S.E.2d 547, 558 (1992); *Strozinsky v. School Dist. of Brown Deer,* 237 Wis. 2d 19, 62-63, 614 N.W.2d 443, 464 (2000); *but see Grey v. First National Bank,* 169 Ill. App. 3d 936, 942-43, 523 N.E.2d 1138, 1143 (rejecting a claim for constructive discharge), *appeal denied,* 122 Ill. 2d 574, 530 N.E.2d 245 (1988), *cert. denied,* 493 U.S. 1020, 107 L. Ed. 2d 739 (1990). As explained by the Maryland Court of Special Appeals in *Beye*:

> [n]ormally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge.

> The law is not entirely blind, however. It is able, in most instances, to discard form for substance, to reject sham for reality. It therefore recognizes the concept of "constructive discharge;" in a proper case, it will overlook the fact that a termination was formally effected by a resignation if the record shows that the resignation was indeed an involuntary one, coerced by the employer.

*Beye,* 59 Md. App. at 649, 477 A.2d at 1201.

For the foregoing reasons, we conclude that under a fair reading of *Coman* as confirmed by *Garner,* North Carolina recognizes the claim of wrongful discharge in violation of public policy where termination is constructive. We therefore reject Defendant's argument that Plaintiff's claim for wrongful discharge cannot stand because her termination was constructive. We must now determine whether Plaintiff presented sufficient evidence in support of her claim of constructive discharge. Specifically, we consider whether Plaintiff presented sufficient evidence that Defendant deliberately forced her resignation.

### III. *Deliberateness*

As indicated by this Court in *Graham v. Hardee's Food Systems,* "a plaintiff alleging constructive discharge 'must demonstrate that the

employer deliberately made working conditions intolerable and thereby forced [the plaintiff] to quit. Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit.' " *Graham*, 121 N.C. App. at 385, 465 S.E.2d at 560 (quoting *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 944 (4th Cir. 1992)); *see also Doyle*, 148 N.C. App. at 177, 557 S.E.2d at 579 (same). "Thus, each claimant must demonstrate that [the employer's] actions were specifically *intended* to force each claimant to quit. Intolerability is 'assessed by the objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign.' " *E.E.O.C.*, 955 F.2d at 944 (quoting *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied*, 475 U.S. 1082, 89 L. Ed. 2d 718 (1986)). (citations omitted).

Here, Plaintiff presented more than a scintilla of evidence demonstrating Defendant's deliberateness. Although Defendant initially took some steps to address Plaintiff's complaints of sexual harassment by initiating an investigation, the evidence tended to show that these measures were completely ineffective at ending the harassment. Defendant in fact promoted Schultz after being informed of his offensive behavior. The store manager, Turner, never informed the field specialist, Morgan, of the new instances of sexual harassment by Schultz reported to him by Plaintiff in November. Although Schultz no longer worked at Plaintiff's particular store after early November, Defendant did not prevent Schultz from coming into the store despite Plaintiff's allegations of continued harassment and threats. During the November meeting, Plaintiff informed Turner and the assistant manager, Streicher, that Schultz was stalking her and following her from the store parking lot to her home. Plaintiff's father confirmed this report. In response, Turner told Plaintiff that Schultz was not banned from the store, and refused Plaintiff's requests for help.

Further, Plaintiff testified that, after reporting the sexual harassment, her working conditions deteriorated still further. In November and December, Defendant decreased Plaintiff's employment to twenty-seven hours per week, the amount of time worked by part-time employees, while all other employees' hours remained the same. Plaintiff also testified that one of the customer service managers began reporting her cash register "till [as] coming up short." The manager repeatedly embarrassed Plaintiff by loudly informing her of shortages in front of employees and customers, in violation of store policy. Plaintiff testified that this problem did not occur prior to making her complaint. Turner, the store manager, stopped speaking to

Plaintiff, as did other employees. Upon tendering her resignation, the assistant store manager stated, "We figured this would happen."

We conclude that Plaintiff's evidence presents more than a scintilla of evidence that Defendant specifically intended to deliberately make Plaintiff's working conditions intolerable. Defendant's refusal to take effective steps in addressing the sexual harassment, the reduction in hours and resulting reduction in pay, the implied allegations of incompetence or embezzlement, the silent treatment, the continued harassment, and the compelling statement from management that they expected she would resign, present a question for the jury as to whether Defendant is liable for wrongful termination. The trial court therefore erred in granting directed verdict on this issue.

In summation, we hold that a viable claim for wrongful discharge exists in North Carolina where the termination violates public policy, even though the discharge is constructive. Plaintiff presented sufficient evidence of her claim for wrongful discharge in violation of public policy to survive a motion for directed verdict. The trial court therefore erred in granting Defendant's motion for a directed verdict on this issue. The judgment of the trial court is therefore,

Reversed.

Judge TIMMONS-GOODSON concurs.

Judge McCULLOUGH dissents.

Judge McCULLOUGH dissenting.

Because I disagree with the majority's conclusion that the claim of constructive discharge based upon either a hostile work environment or in retaliation is authorized under the public policy exception to the employee-at-will doctrine set forth in *Coman v. Thomas Manufacturing Co.*, 325 N.C. 172, 381 S.E.2d 445 (1989), I respectfully dissent. I also dissent in the case *sub judice* on the grounds that even if constructive discharge claims are authorized, plaintiff's case lacks sufficient evidence on the elements of the claim to withstand a motion for a directed verdict.

## I. Claims for Wrongful Discharge

Plaintiff contends, and the majority agrees, that the North Carolina Supreme Court conclusively recognized the tort of con-

structive wrongful discharge in the case of *Coman*, 325 N.C. at 175, 381 S.E.2d at 447. I do not read *Coman* so broadly, but instead read its holding as more narrowly defined by the issue presented in that case: "Our present task is to determine whether we should adopt a public policy exception to the employee-at-will doctrine." *Id.* The Court went on to adopt the public policy exception as a claim for wrongful discharge. I believe this is an altogether different claim than that of constructive discharge and therefore would distinguish this opinion from *Graham v. Hardee's Food Systems*, 121 N.C. App. 382, 386-87, 465 S.E.2d 558, 561 (1996). In *Graham*, our Court seems to hold that a constructive discharge claim falls within the public policy exception of a wrongful discharge to an at-will-employee, and therefore requires proof that the discharge was in contravention of the public policy of North Carolina. *Id.*

#### A. The Public Policy Exception to an at-will-employee

Generally, an at-will-employee may be discharged without reason. *Still v. Lance*, 279 N.C. 254, 260, 182 S.E.2d 403, 407 (1971). However, in *Coman* the Court held that, should an employee be discharged for failing to follow an employer's demands, where such demands violate public policy, discharging that employee on the grounds of this failure is unlawful. The Court found authority for this exception in *Sides v. Duke University*, 74 N.C. App. 331, 342, 328 S.E.2d 818, 826, *disc. review denied*, 314 N.C. 331, 333 S.E.2d 13 (1985), where this Court stated:

> [W]hile there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent.

The issue in *Sides* was the employer's demand that the employee perjure herself in a malpractice lawsuit; the issue in *Coman* was the employer's demand that the employee violate federal trucking regulations and falsify logs. The Court found both of these demands violated public policy. *Coman*, 325 N.C. at 175, 381 S.E.2d at 447. In *Coman*, the employee who refused to violate the federal trucking regulations had his pay reduced by fifty percent, which the Court determined was tantamount to discharge. *Id.* at 173-74, 381 S.E.2d at 446. It is clear from *Coman*, that a claim under this wrongful discharge

**WHITT v. HARRIS TEETER, INC.**

[165 N.C. App. 32 (2004)]

required some affirmative demand of an employee by the employer to violate public policy.

### B. Elements of Hostile Work Environment Constructive Discharge

A separate and distinct wrongful discharge claim, one other than the public policy exception to the at-will-employee doctrine as defined in *Coman,* is a claim in tort for a hostile work environment constructive wrongful discharge. North Carolina state courts have yet to adopt this type of claim. *Graham,* 121 N.C. App. at 385, 465 S.E.2d at 560.

In the interest of judicial economy, however, our Court in *Graham* assumed *arguendo* what the elements of this constructive discharge claim would be. *Id.* In so doing, we sought guidance from the Federal Fourth Circuit Court of Appeals as to the elements of the claim. "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985). In *Bristow,* the Fourth Circuit required deliberateness be shown by the following:

> Our decisions require proof of the employer's specific intent to force an employee to leave[.] *Intent* may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions[.]

*Id.* (citations omitted) (emphasis added). The *Bristow* Court required that intolerability be assessed by the following: "[A]s the circuits uniformly recognize, [intolerability] is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign." *Id.* (emphasis added).

### II. Plaintiff's Claim of Constructive Discharge

Assuming *arguendo* that North Carolina courts have adopted the claim of constructive discharge, a claimant would be required to bring forth the elements of the claim as set out in *Bristow. See Graham,* 121 N.C. App. at 385, 465 S.E.2d at 560. Because I do not believe plaintiff supported her case with more than a scintilla of evidence as to the element of defendant's deliberateness or intent, I would hold the trial court was correct in granting the motion for directed verdict at the close of all evidence.

## A. Standard of Review

A motion for a directed verdict under Rule 50(a) of the North Carolina Rules of Civil Procedure presents the same question for both trial and appellate courts: whether the evidence, taken in a light most favorable to plaintiff, was sufficient for submission to the jury. *Helvy v. Sweat*, 58 N.C. App. 197, 199, 292 S.E.2d 733, 734, *disc. review denied*, 306 N.C. 741, 295 S.E.2d 477 (1982). The question of the evidence's sufficiency is a matter of law, and the motion should be reversed if there is more than a scintilla of evidence to support all the elements of plaintiff's *prima facie* case. *Southern Railway Co. v. O'Boyle Tank Lines*, 70 N.C. App. 1, 4, 318 S.E.2d 872, 875 (1984). Therefore, this Court reviews the record and transcript *de novo*, reversing upon a finding of more than a scintilla of evidence supporting each element of plaintiff's *prima facie* case.

## B. The Element of "Deliberateness" in Constructive Discharge

Plaintiff alleges the following evidence, put forth in their case in chief, is more than a scintilla of evidence to establish the element of defendant's "deliberateness." In making this claim, plaintiff argues that this element does not require specific intent, but can be met so long as an employer "tolerates discriminatory working conditions that would drive a reasonable person to resign." *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 364 (D.C. 1993). I would disagree, citing the stricter *Bristow* standard: "Our decisions require proof of the employer's *specific intent* to force an employee to leave." *Bristow*, 770 F.2d at 1255 (emphasis added). Under either of these standards, the evidence was no more than a scintilla as to the element of deliberateness.

Plaintiff alleges the following evidence meets the "more than a scintilla" standard to survive a directed verdict on the question of defendant's "deliberateness": Plaintiff first began employment with defendant in the spring of 1999 at their Kernersville store. At that time, she signed a copy of defendant's sexual harassment policy and was put on notice to take any concerns to management, or use the toll-free number in the back of the store for complaints.

Plaintiff began to be sexually harassed at her job in July of 1999 by co-employee Randy Schultz. Mr. Schultz worked in the meat department. The harassment consisted of daily sexual comments by Mr. Schultz when he would visit plaintiff at her register. This continued up until 26 October 1999, when plaintiff first reported the

**WHITT v. HARRIS TEETER, INC.**

[165 N.C. App. 32 (2004)]

harassment to defendant's management. She first told her immediate supervisor, who on the same day arranged to have her speak with Mike Turner, the store manager. Also on 26 October 1999, Mr. Turner contacted a special field specialist, Shirley Morgan, in Charlotte, North Carolina, to come and interview plaintiff. The field specialist told plaintiff she would get back with her in a week, but in fact got back in touch with her a "couple of weeks" later.

In the first week of November, four days after plaintiff's concerns were brought to the attention of management, Mr. Schultz was transferred to another of defendant's locations to start a management trainee program. In another meeting with Mr. Turner, plaintiff again discussed the continued sexual harassment and alleged threats by Mr. Schultz, despite his being transferred. Mr. Turner responded to these contentions, "Well, as far as I know he's not been banned from the store." He said he would again contact Ms. Morgan (the field specialist), but plaintiff did not hear from Ms. Morgan immediately.

Mr. Schultz occasionally came into the store throughout November to do paperwork, buy something, or just "hang out." In mid to late November, plaintiff met with Ms. Morgan at McDonald's where she was told the investigation had been completed, Mr. Schultz had denied everything, and they had found no evidence to corroborate her story. Plaintiff alleged that defendant was still making sexual statements to her after this meeting, and arranged a third meeting with Mr. Turner and a co-manager. Her father was also present. Plaintiff alleged defendant was stalking her, physically touching her, and making threatening phone calls. To this, Mr. Turner replied, "Wendy, what do you want me to do about it?"

Plaintiff alleged that incidents of both sexual comments and physical touching continued throughout November. Twice during November, Mr. Schultz followed plaintiff out of defendant's parking lot in his car after plaintiff had finished work. Plaintiff contacted Ms. Morgan one last time at the end of November by phone. In December, plaintiff alleged defendant continued to make sexual statements to her, approximately two to three times a week.

Randy Schultz was known by plaintiff, fellow employees, and management to be having an affair with a fellow coworker before his November transfer to the management program. Defendant has a policy that its employees can be immediately discharged for "immoral conduct on or off the job." Defendant never sought to discharge Mr. Schultz on these grounds.

From January 2000 to 22 February 2000, Mr. Schultz made no further attempts to contact plaintiff, by phone or otherwise. Plaintiff gave defendant notice of her resignation 22 February 2000.

Defendant's undisputed evidence, offered to show the lack of deliberateness as to plaintiff's resignation, was as follows: Defendant was not on notice of the alleged sexual harassment until 26 October 1999. That same day, the defendant took immediate action, having plaintiff interviewed by both Mr. Turner and Ms. Morgan (arriving from Charlotte). The following day Mr. Schultz was interviewed as to the alleged incidents. There was no evidence to corroborate plaintiff's allegations and therefore no basis upon which to credit plaintiff or discredit defendant.

As Mr. Schultz was set to transfer four days after the complaint, defendant considered this a remedy to the problem because the two would no longer be working in the same store. Mr. Turner had recommended Mr. Schultz be placed in the management program before he was on notice of the alleged sexual harassment allegations. The allegations by plaintiff were the first of their kind against Mr. Schultz. Because Mr. Schultz had been selected for the management program, Mr. Turner told Ms. Morgan that he "wanted to get this investigation started as soon as possible and get to the bottom of it."

The field specialist conducted the investigation, and recommended the following:

> We knew that Randy was no longer at the store because he went into the MDP store and he moved out of that store I think two or three days after that. Our recommendation was, because we could not corroborate the allegations, that we go back to Wendy and Randy with follow-up memos and let them read the harassment policy indicating that they understood that harassment is not tolerated in the future. If anything happened in the future, it should be reported.

Both plaintiff and Mr. Schultz were given a copy of defendant's harassment policy, and both were signed: plaintiff signed 22 November 1999, and Mr. Schultz signed 23 November 1999. In late November, Ms. Morgan was contacted one last time by plaintiff alleging that Mr. Schultz had come back into the store at one time, and that she had been receiving threatening phone calls from someone she believed to be him. At that time, Ms. Morgan offered that "if [plaintiff] felt uncomfortable, she could work in Winston-Salem or

Greensboro of her choice," to which plaintiff responded, "she said she would think about that and let [Ms. Shirley] know." After this offer of transfer and notification to plaintiff that the investigation was closed, plaintiff provided no clear evidence that she brought any further notice to defendant of harassment occurring in December, all alleged to have occurred by phone calls to plaintiff's parents' home. It should be noted that there are no allegations of any harassment by Mr. Schultz in either January or in the three weeks in February before plaintiff's resignation.

When reading all evidence in a light most favorable to the plaintiff, granting all reasonable inferences therefrom, I am not in a position to ignore defendant's undisputed evidence. For this reason I believe the trial court was correct in denying a directed verdict motion at the close of plaintiff's evidence, but was also correct in granting the motion at the close of all evidence.

I believe that the "deliberateness" element of constructive discharge as set out in *Bristow*, cannot as a matter of law be shown where defendant has undisputedly responded immediately to plaintiff's complaint, in accord with the harassment policies that plaintiff signed, and where part of this response was an offer to transfer plaintiff in order that her employment may be retained. Furthermore, the record is clear that defendant considered the fact that Mr. Schultz was set to be moved to a new store in a matter of three or four days after the harassment claims were first brought to their attention. Defendant was reasonable in considering this a convenient and proper means to resolve an uncorroborated he-said, she-said scenario. Finally, plaintiff worked for nearly two months before her voluntary resignation, during which time she raises no allegations of harassment or any attempt by defendant to have her resign.

I find support in *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir. N.Y. 2000). In that case, the Second Circuit required something "beyond mere negligence or ineffectiveness" to show that an employer's handling of plaintiff's complaints amounted to a "deliberate" attempt to make her work place so intolerable that she would resign. *Id.* at 74.

The undercurrent of plaintiff's argument is that, short of terminating Mr. Schultz, no response by defendant would be adequate.[1]

---

1. It should be noted here that the jury found that no damages were proximately caused by defendant's alleged negligent retention of Mr. Schultz or intentional infliction of emotion distress.

While this may be true had there been some corroborative evidence supporting claims for harassment, here no such corroborative evidence has been offered, even when read in the most favorable light to plaintiff.

In sum, I do not believe constructive discharge falls under the public policy exception of the at-will-employee doctrine as set out in *Coman*, but is a separate and distinct claim. I would therefore distinguish this case from *Graham* on that point, because *Graham* seemed to require a constructive discharge claim meet both the elements of deliberateness and intolerability, and also required a showing of a violation of North Carolina public policy under *Coman*.

Finally, applying the facts of this case to *Graham* and *Bristow*, even if the constructive discharge claim was cognizable in North Carolina or should our Supreme Court hold it to be so, there was not sufficient evidence as to the element of deliberateness for the claim to survive a motion for directed verdict at the close of all evidence. I would therefore affirm the trial court.